David Leon SCHUESSLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–81–00092–CR.

Court of Appeals of Texas,
El Paso.

Feb. 2, 1983.

State's Rehearing Denied March 2, 1983.

Discretionary Review Granted
June 22, 1983.

Charles M. Mallin, El Paso, for appellant.

Steve W. Simmons, Dist. Atty., El Paso, for appellee.

Before STEPHEN F. PRESLAR, C.J., and WARD and SCHULTE, JJ.

## OPINION

WARD, Justice.

This is an appeal from a conviction for murder. The jury assessed punishment at thirty years confinement. We reverse and remand.

Appellant was convicted of the strangulation murder of his four year-old daughter. He, his wife, and his child were residing in Phoenix, Arizona. Appellant was described as a very loving father, carrying much of the child-rearing responsibility due to his wife's alcoholism. In October, 1979, Appellant's behavior began to radically change in all respects other than his relationship to his daughter. He became increasingly withdrawn and suspicious. Without cause, he began to express fears that his employer was planning to fire him. On January 16, he met his wife and daughter at a laundromat and in an extremely agitated manner, told them they had to flee to the San Carlos Indian Reservation (his wife's original home). At first, he wanted to simply abandon the clothing in the washing machine, but subsequently helped complete the laundering. He drove at uncharacteristically high speed to the reservation where they met with his wife's family. He repeatedly expressed fears that unspecified persons were after him. The entire family began a drinking session which lasted until the next morning. No evidence suggested that Appellant drank to a point of intoxication. The Appellant began to express a belief that his brother-in-law had placed a hex upon him. The next day he left his wife at the reservation and drove towards Texas with his daughter.

On January 19, Jan Kruse was driving from Stanton, Texas to her parents' home in Ira. [The statement of facts sets forth the name of the town as "Iran;" however, the correct name of the town located in Scurry County is "Ira."] Appellant pulled up next to her on the highway and stared at her. She became concerned and tried to evade the Appellant by leaving the highway. He began to follow her, travelling at speeds of up to ninety miles per hour. The last fifteen miles to Ira, he pursued her at speeds of eighty to ninety miles per hour despite a left front tire blow-out. She arrived at her father's gasoline station; Appellant pulled up immediately after her. He exited his vehicle and tried to give her two stuffed animals. Her personalized license plates were a "signal" that she was the necessary recipient of these hexed objects. Mr. Kruse called the sheriff's department. Deputies Anderson and Chaney arrived and found Appellant slumped over in his vehicle. They asked him to step out, and during a frisk, found the two stuffed animals concealed in his shirt. Appellant

presented an expired Arizona driver's license. Anderson described the Appellant as confused, disoriented and mentally upset. He likened his behavior to intoxication but could detect no alcohol involvement. He was taken into custody on the basis of the expired license and potential charge of reckless conduct. He was arraigned at the Scurry County Courthouse and placed in the adjacent jail. He was allowed to call his brother in Kansas, but hung up without indicating where he was or what his difficulties were. Deputy Anderson then spoke to the brother, stating that the Appellant needed help and was being held as much for his own welfare as for any other reason. The brother indicated that he and another brother would arrive the next day, Sunday, January 20, to take custody of the Appellant.

Appellant's condition did not improve. At 6:30 p.m., Anderson and Chaney visited his cell to ascertain if there were any closer relatives that should or could be contacted. In response to inquiry as to his marital status, Appellant responded that he was married to Irmagene Yelloweyes, but that her brother, George, had killed her. At this point no warnings had been administered by either the magistrate or the peace officers. Without further questioning, Appellant launched into a thirty-minute narrative description of his strangulation of his daughter, Collette. Both he and Collette had been hexed. A devil in the form of a black horse was trying to take her soul. He saw her head swell and her arms and legs shrink. He killed her to save her soul, carried her an unknown distance in the vehicle, then left her beside the road. The deputies contacted the Phoenix police and subsequently spoke to Irmagene Yelloweyes Schuessler on the telephone. They learned that the daughter was in fact missing and believed to be with the Appellant. Appellant provided no other information as to Collette's whereabouts. On Sunday morning, Appellant's brothers arrived and tried to talk to him. He did not believe they were his brothers. He would not discuss Collette. He refused to let anyone put out cigarettes in his presence, instead standing

them on their filters to burn out. On Monday morning he appeared before the magistrate. His brother paid the minimum fine recommended by Deputy Anderson and imposed by the court. At the deputy's direction, he was examined by the county health doctor and then released. Three days later, a Border Patrol agent located Collette's body one mile from the Sierra Blanca checkpoint in Hudspeth County.

En route to Kansas, Appellant went through his brothers' luggage and the rear area of the car looking for an imagined animal. He would not eat food or sleep. He did, however, put out cigarettes with his mouth, burning his lips repeatedly. He then ate the cigarettes. On the morning after his arrival in Kansas, he ran into the woods in sub-freezing weather, returning later wet and barefoot. He was examined by the family doctor and then admitted to a local veteran's hospital. On February 14, he was examined by Dr. Herbert Modlin, a psychiatrist from the Meninger Foundation in Topeka, Kansas. Dr. Modlin testified at trial that Appellant was suffering from acute paranoid psychosis throughout the month of January, 1980. Dr. Modlin concluded that at the time of the murder Appellant, as a result of this mental disease, did not know his conduct was wrong and was also incapable of conforming his conduct to the requirements of the law. This conclusion was also reached by psychiatrist Dr. Ben Hill Passmore and clinical psychologist Dr. Luis Natalicio, both of whom examined the Appellant in El Paso after his March 1980 extradition.

To counter the evidence of legal insanity, the State offered the testimony of Dr. Jack Butler, who examined the Appellant in May. Dr. Butler declined to offer an opinion as to the question of legal insanity at the time the murder was actually committed. He expressed great respect for the judgment of the other witnesses on this issue but could not personally testify that Appellant was either legally sane or insane at the time of the offense. He did conclude that Appellant was definitely suffering from acute paranoid psychosis during the

months of October, 1979 through February, 1980. The departure from Phoenix and San Carlos, the high-speed chase of Jan Kruse, the hexed stuffed animals, and Appellant's behavior on the trip to Kansas all indicated a psychotic episode, and bracketed the time of the murder. Butler further indicated that the psychosis may have originated in 1978 as a result of Appellant's having been stabbed by his wife during an argument. Butler's testimony did not refute the defensive evidence of insanity, and in fact confirmed it in many respects. The only other rebuttal evidence came from two Texas jailers who observed no bizarre behavior on Appellant's part after extradition to Texas. Appellant had been receiving treatment for three months, however, by the time they observed him. Drs. Passmore, Natalicio, and Butler all indicated that during this latter time period Appellant was in the process of recovery. During deliberation on guilt, the jury asked the court what consequences would flow from a verdict of not guilty by reason of insanity. The court instructed them that such consequences were beyond the scope of their deliberations. This was followed by a verdict of guilty.

█ Grounds of Error One through Four present various challenges to the admissibility of Appellant's oral admission that he strangled his daughter. The complaints include failure to administer *Miranda* warnings prior to the admission, failure to comply with the warning and oral statement requirements of Tex.Code Crim.Pro. Art. 38.22, failure to satisfy the constitutional standards of voluntariness, and denial of right to counsel.

We have concluded that none of the constitutional or statutory safeguards relied upon by Appellant are applicable in this case. Appellant concedes that all of the above complaints necessitate a finding that the oral admission was the product of a custodial interrogation *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and its offspring, including Article 38.22, pose limitations on the manner in which a statement may be extracted from

an accused. They do not apply in the case of a volunteered statement. Appellant correctly distinguishes between a "voluntary" statement, subject to fifth amendment strictures, and a "volunteered" statement, fully admissible regardless of warnings or presence of counsel. Appellant places heavy reliance upon the opinion in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in urging this Court to assess the statement under the fourth amendment standards. The very portion of that opinion which he quotes in his brief clearly eliminates the admission in this case from such an analysis. *Innis* indicates that:

> [t]he *Miranda* safeguards come into play whenever a person in custody is subjected either to express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to the words or actions on the part of the police officers that they should have known were reasonably likely to elicit an incriminating response.

*Innis,* 446 U.S. at 300–302, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–308.

█ There is no question that Appellant was in custody. We do not find that the questioning involved amounted to interrogation as defined by *Innis.* Deputies Anderson and Chaney were by their own description dealing with a mentally disturbed individual. Anderson advised Appellant's brother that he was being held for his own protection more than for the traffic violation. Appellant had not been in contact with his Kansas brothers for five years and

they would not arrive at Snyder until the following day. Given the continuation of Appellant's disoriented behavior, Anderson and Chaney decided to attempt to locate other closer relatives who might be of assistance to the Appellant. This certainly involved "express questioning" but we construe it as falling within the exclusion recognized by *Innis* as normally attendant to arrest and custody. They asked Appellant about his marital status at which time he asserted that his wife, Irmagene Yelloweyes, had been killed by her brother George. Without further question, he began his description of strangling his daughter to prevent the loss of her soul to a "black horse" devil. In our estimation, this also falls under the *Innis* exclusion of a totally unanticipated response to a question not reasonably likely to elicit an incriminating answer. Even after the admission, it was not taken as an incriminating statement by the officers. They did contact Phoenix, but the statement as to his wife's murder was promptly refuted by Anderson's talking to the woman herself. The child was still missing, but Appellant was released the following day, the officers knowing that he was about to leave the state. Under the clear guidance of *Innis,* we conclude that the admission in this case was volunteered. It was given in a context of custody and express questioning but the relationship between the questions and the response was not such as to give rise to a meritorious fifth amendment challenge.

■ Appellant further contends that his mental state rendered him incompetent to give a truly voluntary statement. This would be true if we were confronted with a product of custodial interrogation. We are not. All of Appellant's cited authority dealing with confessions obtained from mentally disturbed subjects involve true interrogation. They weigh the ability of the subject to understand and exercise his constitutional and statutory rights against the influence exerted by law enforcement authorities. Appellant may have been mentally disturbed at the time, but the only compulsion influencing his admission was internal and not that of custodial interroga-

tion. Having concluded that his declaration was volunteered, his capacity to surrender a constitutionally voluntary confession is irrelevant. His mental state was certainly relevant to the jury's determination of the accuracy of his admission but was not a prerequisite for its admissibility. Grounds of Error Nos. One through Four are overruled.

■ Based upon the above conclusions, it was not error for the court to refuse Appellant's requested jury charges on voluntariness of the confession and administration of *Miranda* warnings. Grounds of Error Five and Six are overruled.

■ The proper admission of Appellant's oral statement provided the jury with direct evidence of guilt. No charge on circumstantial evidence was necessary. Ground of Error No. Seven is overruled.

■ In Ground of Error No. Eight, Appellant contends that the court erred in admitting State's photographic Exhibits 6 through 12. These were photographs of the deceased taken at the scene and at the morgue. In addition to depicting the strangulation marks on the victim's throat, they depicted post-mortem damage to the face by small animals. The admissibility of photographs is within the primary discretion of the trial judge. It is no longer necessary that gruesome, potentially inflammatory photographs relate to a contested issue before they are admissible. They need only fairly and accurately depict information relevant to the cause of action. *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972). If a verbal description of the body is admissible, then corresponding photographs are also. *Id.* Here, the testimonial description of the post-mortem injuries was introduced without objection, opening the way for the photographs. We see no distinction between the introduction of the photographic exhibits in this case and those upheld in *Burks v. State,* 583 S.W.2d 389, 392 (Tex.Cr. App.1979) and *Knoppa v. State,* 505 S.W.2d 802, 803–804 (Tex.Cr.App.1974). Ground of Error No. Eight is overruled.

In Grounds of Error Ten and Eleven, Appellant complains of the court's refusal to respond to the jury's inquiry with a supplementary instruction on the consequences of a finding of not guilty by reason of insanity. We see no justification to depart from the rule set out in *Granviel v. State,* 552 S.W.2d 107, 122 (Tex.Cr.App. 1976). The consequences of such a verdict are beyond the proper scope of jury deliberation. The entire concept of our trial procedure involves a progression from evidence to factual finding to verdict. Appellant's suggestion would permit a reversal to that flow and encourage juries to manipulate their fact-finding function to achieve a particular result. Grounds of Error Ten and Eleven are overruled.

In Ground of Error No. Nine, Appellant challenges the jury verdict as contrary to the great weight and preponderance of the evidence. Under Texas Penal Code Sections 8.01 and 2.04, Appellant bore the burden of establishing his affirmative defense of legal insanity by a preponderance of the evidence. Under the provision of the 1980 amendment to Article V, Section 6, of the Texas Constitution, this Court is vested with conclusive authority over all questions of fact presented on appeal. Our ultimate jurisdiction over questions involving the factual sufficiency of the evidence is further reflected in the constitutionally acceptable portion of Article 44.25 of the Code of Criminal Procedure. Regardless of this mandate, it is no casual act of review for any appellate court to supplant the fact-finding results of a criminal jury trial. The decisions of the jury should be given great deference. Prior to the transfer of criminal jurisdiction to the Court of Appeals, the Court of Criminal Appeals aptly summarized its position regarding the insanity defense and the subsequent jury findings. In *Graham v. State,* 566 S.W.2d 941 (Tex.Cr. App.1978) at 952:

Ultimately the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and weight of the evidence, but also as to the limits of the defense itself. This is because, as discussed in the preceding section of this opinion, the issue is not, strictly speaking one of medical fact. [Citations omitted] The issue encompasses more than mere facts, requiring a considered judgment of whether the accused as a *result* of mental disease or defect did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated. The "mental disease or defect" component is one that limits the availability of the defense, not one that automatically invokes its protective shield. In deciding whether the abnormal mental condition of the accused will excuse criminal responsibility, the jury is not restricted to medical science theories of causation. The connective "result" requirement of the issue encompasses the inarticulable ethical component, which includes imperatives of free will, self control, and responsibility for one's acts that are fundamental to our notions of man, and that are the foundation of social relations and criminal responsibility built on such a concept of man. Rarely will this Court overturn a jury's findings on this issue. *Kiernan v. State,* 84 Tex.Cr.R. 500, 208 S.W. 518 (1919), and *Gardner v. State,* 85 Tex.Cr.R. 103, 210 S.W. 694 (1919), cited by appellant were two such cases. This is not such a case.

The Court of Criminal Appeals was speaking in that case from its own jurisdictional position of passing on the claim that the defendant had proved his defense as a matter of law. The insanity defense is an affirmative defense and the burden of proof of such defense is on the defendant by a preponderance of the evidence. Failing to receive a favorable finding on the issue on which he had the burden of proof, the defendant was required to appeal to the Court of Criminal Appeals on the most difficult challenge that the defendant had established the defense as a matter of law because the Court of Criminal Appeals was without jurisdiction to entertain a defendant's factual challenge that the jury verdict on the insanity issue was contrary to great

 

weight and preponderance of the evidence. Art. V, Sec. 6, Texas Constitution; *White v. State,* 591 S.W.2d 851 at 854 (Tex.Cr.App. 1979); *Combs v. State,* 643 S.W.2d 709 (Tex. Cr.App.1982).

■ As previously pointed out, this Court on this insanity issue is empowered to pass on the factual challenge made to the contrary jury finding and in doing so, we consider all of the relevant evidence presented and if this Court determines that the defendant carried his burden at the trial and that the jury's finding was manifestly unjust, then it is this Court's duty so to speak, to undo or "unfind" the jury's answer by reversing the trial court's judgment and remanding the cause for a new trial because of the unjust findings. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 at 662 (Tex.1951).

■ In the present case, the overwhelming evidentiary disparity compels us to sustain the Appellant's present ground of error. The evidence recited above is but a portion of the testimony indicating Appellant's legal insanity at the time of the commission of the offense, and yet, standing alone, it is sufficient to overturn the existing verdict. A further recitation of the facts is unnecessary. The testimony of Appellant's wife and brother, of Jan Kruse and her father, of the arresting officer, of two psychiatrists and a clinical psychologist clearly establish the existence of this affirmative defense. The State's own expert witness credited the testimony of these other witnesses. He also diagnosed Appellant's condition as one of acute psychosis, prior to, contemporaneous with, and antecedent to the murder. All that he withheld was any conclusion as to legal insanity at the moment the act was committed. The two jailers merely testified that, after extradition three months after the murder, and following some psychiatric treatment, they observed no bizarre behavior on Appellant's part. The State's rebuttal amounted to no evidence of sanity. The Defense presentation produced overwhelming evidence of insanity. The jury's inquiry is further indication of the proper outcome in the case, but is overshadowed by the evidence itself. We find that the jury's verdict was contrary to the great weight and preponderance of the evidence. This conclusion, coupled with the Defense's burden on this issue, poses no bar to retrial. *Tibbs v. State,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Ground of Error No. Nine is sustained.

The judgment is hereby reversed and the cause remanded for new trial.