David Stuart SCHOFIELD, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–83–00190–CR.

Court of Appeals of Texas, El Paso.

Aug. 17, 1983.

David Chapman, San Antonio, for appellant.

Edward Shaughnessy, III, Asst. Cr. Dist. Atty., San Antonio, for appellee.

Before WARD, OSBORN and SCHULTE, JJ.

## OPINION

SCHULTE, Justice.

This is an appeal from a conviction for murder. The judge assessed punishment at life imprisonment. We affirm.

Grounds of Error Nos. One and Two contend that the jury's verdict was contrary to the great weight and preponderance of the evidence that Appellant was legally insane at the time of the alleged offense. Appellant relies upon *Kiernan v. State,* 84 Tex.Cr.R. 500, 208 S.W. 518 (Tex. Cr.App.1919) and *Gardner v. State,* 85 Tex. Cr.R. 103, 210 S.W. 694 (Tex.Cr.App.1919). We agree with his contention that the present Texas Courts of Appeals have authority to overturn such a verdict in an appropriate case as we indicated in *Schuessler v. State,* 647 S.W.2d 742 (Tex.App.—El Paso, 1983, PDRG). As stated in that case, however, the burden of the insanity defense is upon the defendant to be met by a preponderance of the evidence, that is, the greater weight of the credible evidence. The fact-finding results of a criminal jury trial must be given great deference at the appellate level. *Schuessler* at 748. In *Schuessler,* we overturned the jury finding of guilt as a consequence of the disparity in the evidence offered by the State and the defense on the same issue and the overwhelming strength of the defendant's evidence. We are not so inclined in this case. While there may be some disparity in the evidence presented by either side herein,

the defensive presentation is exceedingly weak, barely justifying a charge on the insanity defense. Under such circumstances, the primary responsibility of the jury in assessing the weight and credibility of the evidence must be honored.

On November 29, 1977, Officer Jefferson visited the Appellant's apartment in response to a call that his wife had not been seen by the caller, Sharon Lewis, for several days and could not be reached. The apartment manager admitted the officer. The apartment was in great disarray, boxes and trash strewn throughout the four rooms. In the kitchen, the officer observed perishable food exposed and spoiling. The refrigerator racks and drawers were stacked outside the machine. Opening the refrigerator door, the officer discovered the body of Appellant's wife. Her head was wrapped in plastic, bound with masking tape. Her knees and head were drawn together by a coat hanger. Autopsy revealed that she died of gunshot wounds to the head and neck. There were two contact wounds to the neck, three wounds to the left side of the head, and one close-range shot to the left eye, the bullet entering the brain. Time of death was approximately November 25. Ballistic reports identified the weapon as a .25 caliber Browning automatic. No weapon was recovered, but a spare used .25 caliber automatic barrel, gun shop receipt in the Appellant's name and owner's manual for a .25 caliber Browning pistol were found in the apartment. Police also discovered spent cartridge casings on the floor and in some bagged trash. Also, in the trash they found blood-stained sheets, a pair of men's shoes and a man's shirt, also stained with blood.

In June, 1978, Appellant, while incarcerated in the Bexar County Jail, sent the Honorable Hippolito Garcia, Judge of the 144th Judicial District Court, a handwritten confession to the murder. Appellant did not deny execution of the letter and it was linked to him by handwriting comparison.

Appellant offered five witnesses to support his insanity defense. The first was Sister Margaret Carew, a nun serving as chaplain for the county jail. She denied any expertise in the areas of psychiatry and psychology. Her formal training in that regard consisted of a three-hour undergraduate course in abnormal psychology. She testified that Appellant was guarded, nervous and uncommunicative. He requested an out-dated version of the Catholic bible which she considered unusual. She testified that he was paranoid and insane without offering any further factual basis for her opinion. She was never questioned as to her understanding of the standard for legal insanity as set out in Tex.Penal Code Ann. sec. 8.01 (Vernon 1979).

Next, the defense offered the testimony of the Honorable Pat Priest, a San Antonio District Judge, who knew the Appellant and who consulted with him as a private attorney shortly after the arrest. Judge Priest testified that his undergraduate degree was in psychology. He had been involved in several competency hearings but never in a case involving the insanity defense. Without providing any factual basis, he expressed his opinion that Appellant was legally insane at the time he saw him. He was neither asked, nor did he venture, his opinion as to the Appellant's sanity at the time of the offense.

The third witness was Dr. Felix Banbaze, a psychiatrist at San Antonio State Hospital. The deceased was his secretary from 1972 to 1975. In 1975, he treated the Appellant for depression. In November, 1977, the deceased contacted Dr. Banbaze concerning marital, emotional and economic difficulties. Appellant was improperly permitted to elicit a diagnosis of his own condition in November, 1977, based upon what the deceased said to Dr. Banbaze. The doctor never examined or treated the Appellant after 1975. Although the diagnosis of paranoid schizophrenia was expressed to the jury, the blatant weakness of this evidence apparently compensated for the breach of evidentiary rules. In any event, Dr. Banbaze never testified that Appellant was legally insane at the time of the offense. He thought he "precariously" could distinguish between right and wrong. He

was not sure whether he could or could not conform his conduct to the requirements of the law.

Dr. John Sparks, Bexar County psychiatrist, examined Appellant four times in January and February, 1981, over three years after the offense. At no time would Appellant discuss the killing with him. Dr. Sparks diagnosed Appellant as a paranoid schizophrenic and, based solely on medical records, ventured the opinion that at the time of the offense, Appellant was legally insane.

Finally, Dr. Richard Cameron, retired county psychiatrist, testified that Appellant was a paranoid schizophrenic since at least 1975, and that he was legally insane at the time of the offense. However, he acknowledged that none of the five psychiatrists who examined the Appellant had ever discussed the facts of the killing with him (the Appellant). He stated that his conclusion of legal insanity at the time of the offense was based primarily upon his consideration of Dr. Banbaze's second-hand diagnosis of November, 1977. This amounted to no basis at all. Cameron examined the Appellant one week after the killing and found him guarded and nervous but oriented as to reality. In a report dated December 9, 1977, he stated that he observed no psychotic or neurotic symptomatology. Finally, Cameron, while adamantly adhering to his diagnosis, stated that in his seven years of examining thousands of inmates, this was a puzzling case and the *only* one in which he had been unable to obtain as much information as he would like to formulate his opinion.

On the other hand, the jury was made aware of the fact that on a split in medical expert testimony at Appellant's first competency hearing, the jury found him competent to stand trial. The booking officer who first contacted Appellant on November 30, 1977, found him normal in behavior. The detective who spoke to him the next day also found him nervous but behaving normally. Appellant's downstairs neighbor testified that during November, 1977, he appeared unfriendly but normal. In early November, the deceased contacted an attorney, Brock Huffman, with regard to obtaining a divorce. This is consistent with the purpose of her visit to Dr. Banbaze and suggests a more matter of fact motive for the killing than insanity.

■ In summary, the evidence of insanity was extremely weak and readily susceptible to rejection by the fact-finder. Under these circumstances, we concur with the jury determination that Appellant failed to discharge his burden under the affirmative defense of insanity. Grounds of Error Nos. One and Two are overruled.

■ In Ground of Error No. Three, Appellant contends that the court erred in dismissing the jury at the close of the guilt stage of the trial. The election form contained in the record displays both "judge" and "jury" struck through and two sets of initials, presumptively the Appellant's and his counsel. The statement of facts reveals that prior to jury selection, in response to inquiry by the court, Appellant orally requested that the jury assess punishment. Shortly thereafter, a conference was held in chambers with counsel for both sides and the Appellant present. Counsel for Appellant stated:

> Your honor, my client would like to re-execute his right to go to the Court for punishment.

The court responded, "He wants to go to the Court for punishment?" Counsel replied in the affirmative. At the conclusion of the guilt-innocence phase, the jury was discharged without objection. Whether we construe the events subsequent to initial election as evidencing a change of mind or as a waiver, the same result obtains. No reversible error is shown. *Hackey v. State*, 500 S.W.2d 520, 521 (Tex.Cr.App.1973). Ground of Error No. Three is overruled.

■ In Ground of Error No. Four, Appellant contends that due to his mental condition he was incapable of voluntarily giving a confession in the form of the letter which he sent to Judge Garcia in June, 1978. He asserts that the court erred in failing to instruct the jury in accordance with Articles 38.22 and 38.23 of the Code of Criminal Procedure. Appellant cites several authorities for the proposition that mental disease or defect may render a confession inadmis-

sible. *Page v. State,* 614 S.W.2d 819 (Tex. Cr.App.1981); *Casias v. State,* 452 S.W.2d 483 (Tex.Cr.App.1970). The concept is correct but inapplicable here. For whatever reason, Appellant falls into an imprecise use of the terms "confession" and "voluntary." His authorities deal with confessions obtained as a result of custodial interrogation. As such, those confessions were sensitive to the provisions of the Fifth Amendment and Article 38.22. Appellant's letter was generically a confession in the sense that it admitted culpability. It was not, however, the product of custodial interrogation and is properly characterized as a "volunteered" statement not subject to Article 38.22. Fifth Amendment "voluntariness" is not an issue. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Nor is the absence of *Miranda* warnings significant. Appellant's mental condition at the time he sent the letter certainly bears upon its weight and credibility but, unlike a State-extracted confession, has no bearing upon its admissibility. The evidence raised no issue under the Fifth Amendment or Article 38.22 which would necessitate a charge under Article 38.23. Ground of Error No. Four is overruled.

The judgment is affirmed.