David Leon SCHUESSLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 289–83.

Court of Criminal Appeals of Texas, En Banc.

Oct. 15, 1986.

---

Charles Michael Mallin (on appeal only), El Paso, Mark L. Bennett, Jr., Topeka, Kan., for appellant.

Steve W. Simmons, Dist. Atty., and John P. Calhoun, Asst. Dist. Atty., El Paso, Robert Huttash, State's Atty., and Alfred Walker, First Asst. State's Atty., Austin, for the State.

## OPINION ON STATE'S MOTION FOR REHEARING

CAMPBELL, Judge.

Appellant was convicted by a jury of the offense of murder. Punishment was assessed at 30 years confinement in the Texas Department of Corrections. The Eighth Court of Appeals reversed the conviction, holding that appellant, contrary to the jury's verdict, had established his affirmative defense of insanity by a preponderance of the evidence.[1] *Schuessler v. State,* 647 S.W.2d 742 (Tex.App.—El Paso 1983).

We granted the State's petition for discretionary review to determine the correctness of that holding.[2] On original submission, we affirmed the judgment of the Court of Appeals. We have since granted the State's motion for rehearing and will now withdraw our original opinion and reverse the judgment of the Court of Appeals.

### I. Facts

A detailed examination of the facts in this case is necessary for this Court to review the Court of Appeals' decision on the insanity issue. In particular, we must focus upon all facts that might be relevant to the defense of insanity. We begin by outlining those facts established by lay wit-

---

1. It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect, either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated.

   V.T.C.A. Penal Code, § 8.01(a) (1974). Amended by Acts 1983, 68th Leg., p. 2640, ch. 454, § 1, eff. Aug. 29, 1983. See V.T.C.A. Penal Code, § 8.01(a) (Supp.1986).

   If the issue of the existence of an affirmative defense is submitted to the jury, the court shall charge that the defendant must prove the affirmative defense by a preponderance of evidence.

   V.T.C.A. Penal Code, § 2.04(d) (1974).

2. We also granted appellant's petition for discretionary review to determine whether appellant could be retried if there was insufficient evidence to support the jury's verdict. However, we need not address that ground because we will find the evidence sufficient.

ness testimony. We then outline those facts established by expert witness testimony.

### A. Lay Witnesses

On January 16, 1980, appellant, his wife and their four year old daughter, upon appellant's sudden urging,[3] left their home in Phoenix, Arizona, and drove to San Carlos, Arizona, to visit relatives. At a family party both appellant and his wife consumed beer. Appellant's wife acknowledge that some persons may have smoked marijuana at the party. Appellant's wife fought with her brother and became increasingly intoxicated. She eventually left without her husband and daughter and returned to Phoenix. Appellant, accompanied by his daughter, left Phoenix the next day in his car.

On January 19, 1980, appellant was seen driving his car alone at high speeds, with a flat tire, while chasing another driver in Scurry County, Texas. After several miles, the female driver of the car being chased stopped at her father's service station and asked her father for help. Appellant exited his car and unsuccessfully attempted to give the woman two stuffed toy animals.

The local sheriff's office received a call for assistance. Appellant was subsequently arrested for driving on a public road with an expired driver's license and taken to the county jail in Snyder, Texas. The arresting officer recovered from appellant the two stuffed animals and two articles of clothing—a blouse and a pair of lady's pants. The officer was told that appellant believed that the stuffed animals were hexed and that the license plate of the car he had been chasing "was a message from the devil that he was supposed to give those hexed dolls to her." (R. II–356).

At the county jail, appellant called his brother Don Schuessler in Barnes, Kansas. The arresting officer spoke with the brother and informed him that appellant had been arrested and "that he was upset, emotionally upset, mentally upset possibly, and needed some assistance...." (R. II–217). Later that evening, appellant told the arresting officer and another officer that he had killed his daughter.[4] Appellant also stated that his wife had been killed by her brother; however, the officer later established that appellant's wife was alive.[5]

In describing the death of his daughter, appellant "went into a story telling [the officers] of a Black Horse religion or Black Horse voodoo. He said that the devil was going to take his daughter's soul." (R. II–224). He also said "that he had seen her head getting bigger and bigger and her arms and legs were getting smaller and he had to strangle her to keep the devil from taking her over." (R. II–358). Appellant stated that his daughter was crying and he slapped her and then choked her to death. While choking her, appellant's daughter kicked him in the shins. Appellant stated that "he had to kill her real quick to keep the devil from getting her soul." (R. II–224).

Appellant then "indicated that he traveled for a long ways and felt of her and made sure she was deceased and he stopped and put her out beside the road. He didn't know here he was at, but along side the road somewhere.... He said he didn't have time to bury the body. He was in a hurry." (R. II–225).

That night, appellant refused to eat and slept on the floor of his cell under his bunk with a blanket hung across the front of the

---

**3.** Appellant's wife testified that appellant approached her in a laundromat as she was doing laundry and demanded that they immediately leave the city. She also stated that, over the last month, appellant had become increasingly concerned about his job, even asserting that his boss was "trying to put a hex on him." (R. II–310).

**4.** Appellant raised four grounds of error before the Court of Appeals challenging the admissibili-

ty of this oral confession. The Court of Appeals rejected all four grounds. *Schuessler,* supra, at 746–47. We refused appellant's grounds of review challenging that holding.

**5.** Appellant's wife called him while he was in jail in Snyder. Appellant told her that he had left their daughter in "a small town in Texas." (R. II–332) He also told her that he thought that she (the wife) had their daughter.

bunk. The next day, his brother Don and another brother, John Schuessler, arrived at the county jail. Appellant gave no outward sign of recognizing his brothers. After speaking with appellant and observing his confused mental state, the brothers further questioned appellant concerning the death of his daughter. However, after several unsuccessful attempts to obtain information about the daughter and her possible location, appellant was released to his brothers' care, and they returned with appellant to Kansas.[6]

During the drive to Kansas, appellant refused to eat food and claimed that he had no need to eat to live. However, he ate several cigarette butts and blistered his lips with burning cigarettes. He occasionally rubbed himself with and smelled a bar of soap he had retained from the jail. Appellant also emptied his brothers' suitcases and "seemed to be looking in and around and under and everything...." (R. II–368). In various conversations with appellant about his early childhood and grade school, the brothers found that appellant "seemed to remember most of the stuff real clear." (R. II–368).

After passing through Dallas, appellant "made what appeared to be a little man or doll of (sic) whatever out of a match box and cigarettes" and became alternately agitated and calm over the direction of travel. (R. II–369–70). The three brothers arrived at Don Schuessler's home in Barnes, Kansas, at four or five o'clock in the morning, and then went to the family's house nearby in Hanover, Kansas.

While playing with Don Schuessler's one year old son, the child "let out a kind of a holler" and appellant "ran out of that room and ran into the other room, ... and he sat in the corner and he was crying" and shaking. (R. II–374). Earlier, John Schuessler observed appellant stare at a crack in the wall. Later, John Schuessler discovered that appellant had rearranged an upstairs bedroom, in which he had slept as a youth,

to create a nest-like bed on the floor. Upon realizing that appellant was missing, John Schuessler discovered appellant "a block and a half away huddled in a chicken coop with a big fuzzy blanket around him and when we got back in the house and confronted him with it he said he was lost." (R. II–395). John Schuessler then noticed that appellant had earlier defecated into a cardboard box in the kitchen, using a dish rag as toilet paper. When confronted, appellant did not appear to know it was wrong that he had defecated in the box.

That afternoon Don and John Schuessler observed appellant running barefoot and in light summer clothing across a field despite a freezing temperature. The brothers chased appellant and found him with wet legs and feet from falling into a frozen river. While being returned to his brother's house, appellant grabbed a light pole and refused to move further. Appellant stated, "Leave me alone, I don't know where I am at." (R. II–377). The brothers eventually returned appellant to the house, placing him in the shower, where he at first refused to undress and had difficulty turning the shower on.

On January 24, 1980, the dead body of appellant's daughter was discovered in Hudspeth County along Interstate 10 by a patrol agent for the United States Border Patrol. The body was left approximately one mile from a border checkpoint, over a fence and in the vicinity of a flashing sign that informed travelers of the upcoming checkpoint.

On January 25, 1980, appellant was arrested and placed in the Shawnee County jail in Topeka, Kansas. He was visited several times by his brother Don who stated that appellant "had gotten worse than when we had him, he looked like he was spooked or something." (R. II–382). In addition, Don Schuessler observed appellant clutching a pair of slippers and rubbing them against his face.

---

6. Appellant at first indicated that he wanted to return to Phoenix, Arizona, "and get this whole mess straightened out." (R. II–367). However, his brothers decided to return to their home in Kansas.

At trial, appellant called various lay witnesses to establish that, although his father had died of lung cancer while appellant was a child, his childhood had been normal. Following high school, appellant entered the armed forces and served in Vietnam. After returning, appellant married and had one child. Appellant was described as a proud, attentive and loving father who had never been observed abusing his daughter.

The State called four lay witnesses in rebuttal. One of those witnesses, a Texas Ranger who observed appellant while in jail in Snyder, Texas, testified that he never saw appellant eating cigarettes while confined. Another witness, a jailer, observed appellant in March of 1980, while he was confined. He testified that appellant did not exhibit any strange behavior. A third witness, another jailer at the Hudspeth County Jail, also observed appellant while he was confined for several months. He testified that appellant did not engage in any abnormal or bizarre behavior.

### B. Expert Witnesses

Appellant presented three expert witnesses: two psychiatrists and one psychologist. The State presented one expert witness: a psychiatrist.

### 1. Appellant's Expert Witnesses

Appellant's first expert witness was Dr. Herbert C. Modlin, a psychiatrist in Topeka, Kansas. Dr. Modlin visited appellant on February 14th and 15th of 1980 and interviewed appellant's wife and Don Schuessler. Finally, Dr. Modlin heard all of the testimony presented at trial.

Dr. Modlin diagnosed appellant as having had a paranoid psychosis.[7] He also testified that appellant's emotions indicated a diagnosis of schizophrenia psychosis in an atypical form.[8] When asked for his opinion on the state of appellant's sanity at the time of the killing, Dr. Modlin concluded that appellant had been seriously mentally ill to the extent that he had not known the legal difference between right and wrong when he killed his daughter.

In cross-examining Dr. Modlin, the State received several relevant responses. First, the State asked Dr. Modlin if he was "familiar with any studies that have indicated the agreement between diagnoses where two or more psychiatrists are involved is 60%?" Dr. Modlin responded, "Yes," and the State followed by asking if "[t]hat would lead to 40% disagreement?" Dr. Modlin responded: "In that particular research project. And as all things in psychiatry we get different results at different times to different people. That is part of human nature." (R. II–423).

Second, the State established that Dr. Modlin had relied upon a diagnostic manual called DSM–II to diagnose appellant.[9] Further, the State established that illnesses defined within DSM–III are occasionally removed or changed by the American Psychiatric Association. On re-direct, Dr. Modlin testified that paranoia and psychosis had been accepted as serious mental illnesses "for 200 years." (R. II–445).

Third, the State established that a study of eight people who entered various hospitals feigning mental illness had shown an error rate of 100% in diagnosing seven of

7. Dr. Modlin testified that *paranoid* thinking refers to an "individual who has paranoid ideas [and] assumes that the environment is attacking him, out to get him[.] [H]e is suspicious." (R. II–413). He testified that *"[p]sychosis is our most serious mental illness and it usually involves thinking behavior, thinking becomes disturbed, primarily by the development of delusions, a false fixed idea which the individual cannot be argued out of (sic) which is not amenable to persuasion, reasoning, or anything else." (R. II–413) (emphasis added).

8. Dr. Modlin testified that "[s]chizophrenia is a type of mental [illness], we have manic depres-

sive, *psychosis,* organic psychosis, it is our most serious mental illness, the one involving a real disruption of personality." (R. II–415) (emphasis added).

9. The diagnostic manual referred to by Dr. Modlin, DSM–II, was updated after his use of it to diagnose appellant. That new manual, DSM–III, is officially known as *Diagnostic and Statistical Manual of Mental Disorders (Third Edition),* (Washington, D.C.: APA, 1980). For a history of the manual's development by the American Psychiatric Association, see pp. 1–2 of that manual.

them as being schizophrenic in remission.[10] On re-direct, appellant established that Dr. Modlin believed that the study was intended to show how poorly State hospitals were staffed and financed.

Fourth, the State asked Dr. Modlin: "Isn't it possible for a person to be mentally ill and perhaps insane but yet not meet either of the tests set out in the Penal Code?" Dr. Modlin answered in the affirmative. (R. II–436). The State followed by asking: "So the scope of mental illness and insanity psychiatrically speaking is much broader than the rather narrow definition given in the Penal Code?" Again, Dr. Modlin replied in the affirmative. (R. II–436).

Finally, the State established that an act such as killing one's daughter could greatly enhance, to the point of degeneration, a process of mental illness that had begun prior to the killing. However, Dr. Modlin would not agree that such a circumstance occurred in the instant case.

Appellant's second expert witness was Dr. Luiz Natalicio, a psychologist in El Paso, Texas. Dr. Natalicio was appointed by the trial court to examine appellant and interviewed appellant on July 2 and August 15 of 1980. Dr. Natalicio testified that he had diagnosed appellant as having a schizophreniform disorder, as classified under the DSM–III. See *Diagnostic and Statistical Manual,* supra, at p. 199–200. In addition, he testified that at the time of the offense, appellant was suffering from acute psychosis.[11] Dr. Natalicio concluded that at the time of the commission of the instant crime, appellant had a mental illness that made him both unable to determine right from wrong and unable to control his behavior with respect to the requirements of the law.

Appellant's third expert witness was Dr. Ben Hill Passmore, Jr., a psychiatrist from El Paso, Texas. Dr. Passmore was appointed by the trial court to examine appellant and interviewed him on July 2, 18, 29 and August 11 of 1980. After reciting before the jury appellant's statements made to him during those interviews, Dr. Passmore made the following conclusion:

> My opinion is he was suffering from a mental disease, specifically schizophreniform psychosis. It is hard to say whether he did not know his conduct was wrong or incapable of conforming. I think the incapable of conforming [standard] kind of encompasses the other if indeed as he told people earlier in the course he was trying to prevent his little girl from being taken over by the devil he would consider his conduct to be right. My opinion was he was insane on the basis of one or the other or both.
>
> \*　\*　\*　\*　\*　\*
>
> If he knew it was wrong he probably couldn't have stopped it in this psychotic state.

(R. II–481).

On cross-examination, the State established that Dr. Passmore was professionally acquainted with a Dr. Butler, who also practiced psychiatry in El Paso. Dr. Passmore acknowledged that Dr. Butler was a qualified expert in the field of psychiatry.

The State also established that appellant had indicated to Dr. Passmore that he had been a heavy drinker immediately prior to the time of the killing of his daughter, and had tried LSD twice while in Vietnam. Dr. Passmore admitted the difficulty in distinguishing between a drug abuse psychosis and one arising from other problems.

Finally, Dr. Passmore was unable to determine whether appellant would have committed the instant crime if a uniformed

---

10. See generally Rosenthal, D. & Kety, S.S. *The Transmission of Schizophrenia.* (Pergamon Press, London, 1968).

11. In explaining this diagnosis, Dr. Natalicio stated that an *acute* mental illness involves "a very severe expression of that particular illness which may not last for more than a period of a few weeks, a few months, and subside via treatment or spontaneously. In the case of an acute psychotic process we are talking of a mental illness that would definitely impair our ability to determine reality from fantasy, good from bad, right from wrong." (R. II–456).

policeman had been riding in the car with him. Dr. Passmore testified that such a question "introduces another variable." However, when asked how he could determine that appellant was insane at any given moment, Dr. Passmore replied, "I think you have to make a decision as to whether at the time of the incident he was sane or insane." (R. II–493). Following another question, Dr. Passmore concluded, "He [appellant] had the potential to be insane at any point in time along this period." (R. II–493).

On redirect, Dr. Passmore testified that, in his opinion, appellant's psychosis was not drug induced. However, on recross-examination, Dr. Passmore stated:

It is known, there is real good evidence now somebody basically schizophrenic should not smoke (sic) marihuana, that will bring on an acute episode. Apparently a small amount of alcohol doesn't have that effect but large amounts of alcohol over long periods of time do.

(R. II–495). The State followed by asking whether "[t]he large amount of alcohol consumed by the defendant eventually could have been the spark that hit the fuse?" (R. II–495). Dr. Passmore responded, "In the sense the alcohol was reducing his ego and ability to stay off it." (R. II–496).

### 2. State's Expert Witnesses

The State called one expert witness, Dr. Jack Butler, a psychiatrist in El Paso, Texas. Dr. Butler interviewed appellant on May 14, 1980 and heard the testimony of witnesses throughout the instant trial. In addition, Dr. Butler listened to an interview by the State of appellant, tape recorded on March 31, 1980.

Dr. Butler agreed that appellant was recovering from "a psychotic process." (R. II–520). However, in discussing the relevance of that process to the question of appellant's legal sanity, Dr. Butler responded to the following:

Q. [by the State] Now doctor is it the same thing to say that the. defendant during this period of time was going through a psychotic episode as it is to say at the time of the conduct charged because of some mental disease or defect, which apparently he has, but as a result of that mental disorder or defect he did not know his conduct was wrong and was incapable of conforming his conduct?

A. [by Dr. Butler] No it is not the same. That has been pointed out previously today. [P]sychosis is a medical term, psychosis in North American means in law (sic) means terms that you have gone crazy, it means little more, they put it into fancy words. One of the previous medical experts testified it means it came all over the world and that is not (sic) true stability of the term, psychosis has remained true centuries, and was implied by one of the witnesses, that is not true. The term psychosis does not necessarily mean you are crazy, it means there has been a sudden change in your personality, perhaps in the direction of being crazy, but I would not say crazy because he had a psychosis. But for common usage in our society psychosis means a complete breakdown of our own dimensions, a breakdown in our thought processes, no longer reasonable and rational. It means a breakdown in feeling such as has been described about the defendant by previous medical witnesses, that his mood it not appropriate to his thought content.

\*　　\*　　\*　　\*　　\*　　\*

The remainder of your question, what is the difference between psychosis and legally insane, you quoted the law, but it is a defense to the prosecution if at the time of the conduct the actor as a result of mental disease or defect did not know the conduct was wrong or was incapable of conforming his conduct to the requirements of the law. That is a legal definition. It is not a medical one. I wanted to stress the two things are different. Psychosis is a medical term, legal insanity is another.

Q. So the two don't mean the same thing?

A. No, although you do need to be psychotic to be legally insane, you do not have to be legally insane to be psychotic. (R. II–520–523).

The State then asked Dr. Butler to assume that on January 16, 1980, appellant had consumed an unknown amount of alcohol. In addition, Dr. Butler was to assume that appellant was seen leaving the next day in a car with his daughter and later admitted strangling his daughter and throwing the body beside the road, over a fence and within view of a sign informing travelers of an upcoming border checkpoint. Finally, the State asked:

Q. Doctor the hypothesis I have given you, can you explain whether or not it is relevant in your opinion you have whether or not at the time of the conduct charged the defendant either knew his conduct was wrong or was able to conform his conduct to the requirements of the law?

A. Yes. This has some relevance for me.

Q. Would you explain for the jury?

A. Very well. I will refer to previous testimony, all of the previous medical witnesses with the exception of Dr. Passmore last night said that the defendant was legally insane throughout the period in December. How they know that and I do not I cannot answer for them. I do not believe that. I can sit her and swear that somebody was legally competent or incompetent when I saw him, but an inference from other information provided to us and what other information have we got, this bothers me a great deal.

Q. In what sense?

A. All right, here is a man who has been described by medical witnesses as so psychotic as to be legally insane because he either didn't know what he was doing was wrong or if he knew it was wrong he couldn't (sic) conduct himself in a manner that would be in keeping with what the law is. Instead of that we have here someone coming along this road, arriving at that point, and there is an inspection station one mile ahead. As far as I could see the first chance after this incompetent individual stops his car at the side of the road, carries a body from his car, dumps it over a fence into a field, gets back into his car, drives through the checkpoint. Now if he is so incompetent, so crazy, how does he know enough to do that. That bothers me. I am not saying it makes him legally sane. I don't know but neither does anybody else.

*     *     *     *     *     *

Q. ... in your opinion this behavior in response to this stimuli is that behavior consistent with an individual who assertedly a) does not know the difference between right and wrong?

A. Well no it is not consistent with that.

Q. Referring to the last portion of Dr. Modlin's report, is that behavior consistent with what Dr. Modlin stated his opinion as being that the defendant was unable to distinguish social moral right from wrong at the time?

A. I am only answering that if it is in fact true that he did this that we have gone through, why would he do that unless he knew it was wrong to go driving along I–10 with a dead body in the car. There is no other answer possible.

Q. Doctor let me ask you whether or not this conduct is consistent with an individual who is incapable of conforming his conduct to the requirements of the law?

A. It doesn't seem to me that doing this, if this individual did it, entirely answers that question. It is necessary to assume that he knew what the law was, there was something illegal about driving around with a dead body in your car, and you don't want to be caught with one. To answer your question it is not consistent with that definition, that portion of the definition of insanity.

Q. You heard Dr. Passmore yesterday testify in effect these two tests are interrelated?

A. Yes sir I heard all of that.

Q. Doctor is it true the person who was incapable of conforming his conduct to

the requirements of the law would behave in a manner similar to what I have described, in your opinion?

A. Well now incapable of conforming you conduct to the requirements of the law would mean something to an individual in the sense if he knows that he is doing something unlawful, and the only defense against prosecution is on the grounds of insanity, conforming may tie to the requirements of the law to dispose of evidence like a dead body. So I don't think the question is exactly capable of being answered.

Q. Uh huh. Doctor, in your professional judgment is it possible for anybody based on the information that you have to state the defendant for several days in January or for the whole month of January or on and off during January was insane at any given moment under the legal definition?

[A.] I believe in the judgment of some of the people who have testified here without question. I think they are giving an honest opinion and it is their opinion he was legally insane. I can't do that. I can't say he was or was not.

Q. Can you agree with their opinions in this case?

A. No.

(R. II–524–527).

## II. Sufficiency

The Court of Appeals reviewed the evidence and found that the record contained an "overwhelming evidentiary disparity." *Schuessler*, supra, at 749. In particular, the Court of Appeals noted that appellant presented sufficient evidence to establish his affirmative defense of insanity and that the State presented "no evidence of sanity." *Id.* Therefore, the Court of Appeals held that the jury's implicit rejection of appellant's affirmative defense of insanity "was contrary to the great weight and preponderance of the evidence." *Id.*

The State argues that the Court of Appeals applied the wrong standard in reviewing appellant's sufficiency claim. In addition, the State argues that sufficient evidence exists in the record to support the jury's verdict. We agree with both points.

This Court recently established the following appellate standard for determining whether there is sufficient evidence to support a jury's implicit rejection of an affirmative defense:

> [An appellate court] must review the evidence of the affirmative defense by looking at the evidence in the light most favorable to the implicit finding of the jury with respect to such affirmative defense and then determine, by examining all the evidence concerning the affirmative defense, if any rational trier of fact could have found that the defendant failed to prove his defense by a preponderance of the evidence.... It is important to note that this analysis does not involve the appellate court in any fact finding function. The test evaluates the legal sufficiency of the evidence using a legal standard. There must be no reweighing or reclassifying of the evidence by the appellate court.

*Van Guilder v. State*, 709 S.W.2d 178, 181 (Tex.Cr.App.1985), cert. denied — U.S. —, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

In the instant case, appellant raised the affirmative defense of insanity, see § 8.01, supra, and had the burden of proving the defense by a preponderance of the evidence, see § 2.04(d), supra. The implicit finding of the jury was that appellant was *not* legally insane at the time he committed the offense of murder. Therefore, we must determine whether the evidence, when viewed most favorably to the jury's verdict, is sufficient to support the jury's implicit rejection of appellant's affirmative defense of insanity.[12]

Several general principles regarding appellate evaluation of a jury's implicit verdict involving a defendant's insanity have

---

12. The Court of Appeals, by applying the "against the great weight and preponderance of the evidence" standard, improperly evaluated the weight and credibility of the evidence presented on the issue of appellant's insanity. See *Schuessler*, supra, at 749.

been established. These principles recognize the complexity of evidence on insanity and defer to the jury's resolution of that issue when conflicting evidence appears in the record. See *Graham v. State*, 566 S.W.2d 941 (Tex.Cr.App.1978).

The issue of insanity "is not strictly medical, and expert witnesses, although capable of giving testimony that may aid the jury in its determination of the ultimate issue, are not capable of dictating determination of that issue." *Graham*, supra, at 949. The circumstances of the offense and the life experiences of the defendant may also aid the jury in considering whether a defendant was insane at the time he committed an offense. *Id.*, quoting *Ross v. State*, 153 Tex.Cr.R. 312, 316, 220 S.W.2d 137, 139 (Tex.Cr.App.1949). For example, "[a]ttempts to conceal incriminating evidence and to elude officers can indicate knowledge of wrongful conduct." *Graham*, supra, at 951. Under some limited circumstances, it may not even be necessary for the State to present medical testimony that a defendant is sane in order to counter testimony by defense experts. *Id.*, at 950.

Furthermore, when testimony conflicts on the issue of insanity, the trier of fact is the sole judge of the weight and credibility to be given to the evidence. Articles 36.13 & 38.04, V.A.C.C.P.; *Madrid v. State*, 595 S.W.2d 106 (Tex.Cr.App.1979) (opinion on rehearing). See also *Van Guilder*, supra; *Jones v. State*, 699 S.W.2d 580, 582 (Tex.App.—Texarkana 1985, no pet.) (jury resolves conflict as finder of fact). For example, the jury may resolve a conflict when the testimony of one witness, whether expert or lay, directly contradicts another witness' opinion. Concomitantly, the jury may resolve a conflict when a witness challenges the reliability of another witness' opinion on insanity. See, e.g., *Van Guilder*, supra, at 182 (explaining *Madrid*, supra). Cf. *Barefoot v. Estelle*, 463 U.S. 880, 900–903 & n. 7, 103 S.Ct. 3383, 3398–99 & n. 7, 77 L.Ed.2d 1090, 1109–11 & n. 7 (1983) (jury capable of resolving evidence challenging reliability of psychiatric predictions of dangerousness).

In addition, proof of a mental disease or defect alone is not sufficient to establish an affirmative defense of insanity. *Graham*, supra at 943. The insanity defense, at the time of appellant's trial, required:

(1) At the time of the conduct charged,

(2) as a result of mental disease or defect,

(3) the defendant either

  (a) did not know that his conduct was wrong, or

  (b) was incapable of conforming his conduct to the requirements of the law he allegedly violated.

See § 8.01, supra. Therefore, if a defendant's evidence is undisputed as to the presence of a mental disease or defect, even if it established *medical* insanity, it would not necessarily establish *legal* insanity. *Graham*, supra, quoting *McGee v. State*, 155 Tex.Cr.R. 639, 238 S.W.2d 707 (Tex.Cr.App.1951).

A defendant must also establish the causal connection between the mental disease or defect and at least one of the two prongs of the test for legal insanity. See (a) and (b) above. In deciding whether the evidence supports such a connection, "the jury is not restricted to medical science theories of causation." *Graham*, supra, at 953. "If the opinions of the experts as given in the evidence do not comport with the jurors' idea of sound logic, the jurors have a right to say so." *Maryland Casualty Co. v. Hearks*, 144 Tex. 317, 321, 190 S.W.2d 62, 64 (Tex.1945). See *Graham*, supra, at 951 (quoting *Hearks*, supra, with approval).

In the instant case, appellant presented uncontradicted evidence that he had a mental illness. The State, in questioning its own expert witness, conceded that appellant "apparently" had some "mental disease or defect." (R. II–520). However, the critical issue was whether, as a result of this mental disease or defect, appellant did not know that his conduct at the time

was wrong or could not conform his conduct to the requirements of the law.

Appellant's three expert witnesses concluded that appellant was legally insane. The State's expert witness, Dr. Butler, concluded that an opinion could not reliably be given on that issue. Through cross-examination of appellant's expert witnesses, the State also challenged the reliability of their opinions. In addition, Dr. Butler indicated a strong logical basis for concluding that appellant was not legally insane. Specifically, Dr. Butler noted that appellant's disposal of his daughter's body near the border checkpoint was not consistent with the standard for legal insanity.

In addition, the State presented testimony from various lay witnesses who had observed appellant's conduct while in jail. While some of those observations were made several months after appellant committed the instant offense, the jury was entitled to give that evidence some probative value.[13] There was also some evidence that appellant's conduct may have been the result of excessive drinking.

■ Given Dr. Butler's testimony challenging the reliability of retroactive diagnosis and the particular facts surrounding the death of appellant's daughter, we find that a rational trier of fact could have resolved the conflicting testimony on legal insanity against appellant. While we certainly understand the Court of Appeals might have disagreed with the jury's resolution of the conflicts in the evidence, it could not interfere with the verdict unless the jury's decision was irrational, i.e. lacking in sufficient logical support in the evidence. Otherwise, an appellate court would serve as a "thirteenth juror with veto power." *Van Guilder,* supra, at 180. We hold that there is sufficient evidence to support the jury's rejection of appellant's affirmative defense of insanity.

The judgment of the Court of Appeals is reversed. The judgment of the trial court is affirmed.

TEAGUE, J., dissents.

CLINTON, Judge, dissenting.

Without unanimity the Court plowed new ground in *Van Guilder v. State,* 709 S.W.2d 178 (Tex.Cr.App.1985), and went back over it in *Baker v. State,* 707 S.W.2d 893 (Tex.Cr.App.1986). Within a week after motion for rehearing was denied in *Van Guilder,* this cause was decided by less than a plurality on original submission. Later I joined the opinion of Presiding Judge Onion dissenting to denying State's motion for rehearing in *Baker,* primarily because he urged the Court to reconsider *Van Guilder.* Now, having analyzed *Van Guilder* from another perspective, I write to suggest that its formulation is based on an faulty premise and is, therefore, erroneous.

Derived from *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which in turn built on *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the notion guiding *Van Guilder* is expressed in the following passage:

"Because some review of the affirmative defense is necessary in such cases in order to afford an appellant due process under *Jackson,* supra, this Court, in keeping with the principles of *Jackson,* supra, must provide a standard of review consistent with constitutional law in this area and the inviolability of the jury as fact finders in Texas criminal law."

*Van Guilder,* supra, at 181. Therein lies the faulty premise.

While "some review" of evidentiary sufficiency going to an affirmative defense is surely appropriate, appellate review cannot be "to afford an appellant due process under *Jackson,*" nor done "in keeping with [its] principles." Both *Jackson* and *Win-*

13. We need not decide whether the testimony of these witnesses, if considered alone, would have been sufficient to support the jury's implicit rejection of appellant's affirmative defense of insanity.

*ship* lay down a constitutional imperative that the State must prove and the trier of fact must find "the essential *elements of the crime* beyond a reasonable doubt." *Jackson*, supra, 443 U.S. at 318–319, 99 S.Ct. at 2788–2789).[1] Every "principle" followed or found in *Jackson* has to do with due process protection against being convicted of crime on insufficient evidence to prove guilt. Accordingly, the relevant question on review of all record evidence is whether any rational trier of fact could have thus found those elements of the offense charged. *Ibid.*

By definition, however, an affirmative defense is *not* an element of an offense. See V.T.C.A. Penal Code, § 1.07(a)(13), § 2.04 and, e.g., § 8.01. Neither *Jackson* nor *Winship* deals with due process requirements of sufficient proof or appellate review *vis a vis* an affirmative defense, and the Supreme Court "[will] not lightly construe the Constitution so as to intrude upon the administration of justice [in that respect] by the individual States," because:

> "[I]t is normally 'within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion,' and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. [citations omitted]."

*Patterson v. New York*, 432 U.S. 197, 201–202, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977).

Charged with murder and permitted by New York law to do so as a factor mitigating degree of criminality or punishment, Patterson raised the affirmative defense of "extreme emotional disturbance." A properly instructed jury found "the essential elements of the charge [of murder] beyond a reasonable doubt," implicitly rejecting his defense in mitigation. Before the Supreme Court the constitutional issue was:

> "The question here is the constitutionality under the Fourteenth Amendment's Due Process Clause of burdening the defendant in a New York murder trial with proving the affirmative defense of extreme emotional disturbance as defined by New York law."

*Id.*, 432 U.S. at 198, 97 S.Ct. at 2320.

After reciting the facts of the matter, reviewing parallel developments regarding the defense of insanity from the common law through its own prior decisions and examining in light of *Winship* and related authorities the claim that his conviction for murder deprived Patterson of due process, the Supreme Court pointed out:

> "In convicting Patterson under its murder statute, New York did no more than *Leland* and *Rivera* permitted it to do without violating the Due Process Clause. Under those cases, once the facts constituting a crime are established beyond a reasonable doubt, based on all the evidence including the evidence of the defendant's mental state, the State may refuse to sustain the affirmative defense of insanity unless demonstrated by a preponderance of the evidence.
>
> The New York law on extreme emotional disturbance follows this pattern. This affirmative defense ... does not serve to negative any facts of the crime which the State is to prove in order to convict of murder. It constitutes a separate issue on which the defendant is required to carry the burden of persuasion; and unless we are to overturn *Leland* and *Rivera*, New York has not violated the Due Process Clause, and Patterson's conviction must be sustained."

*Id.*, at 206–207, 97 S.Ct. at 2325.

Refusing to reconsider *Leland* and *Rivera*, the Supreme Court then noticed current trends among the States in tailoring affirmative defenses as they fashioned new penal codes from model penal codes. While it is certainly true that in *Patterson* the Supreme Court was not formulating standards of appellate review for sufficiency of evidence supporting an affirmative defense, the point it clearly makes is that

---

**1.** All emphasis is mine throughout unless otherwise indicated.

the Due Process Clause is not a restriction on when and how a State "chooses to recognize a factor that mitigates the degree of criminality or punishment [and] assure[s] itself that the fact has been established with reasonable certainty." *Id.*, 432 U.S. at 209, 97 S.Ct. at 2326. Believing such matters are better reposed in the States, the Supreme Court "thus decline[d] to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused." *Id.*, at 210, 97 S.Ct. at 2327.[2]

Finally, the Supreme Court emphasized that holding the Due Process Clause is not violated by statutory treatment of true affirmative defenses does not offend principles of *Winship, viz:*

> "Long before *Winship*, the universal rule in this country was that the prosecution must prove guilt beyond reasonable doubt. At the same time, the long-accepted rule was that it was constitutionally permissible to provide that various affirmative defenses were to be proved by the defendant. This did not lead to such abuses or to such widespread redefinition of crime and reduction of the prosecution's burden that a new constitutional rule was *required. This was not the problem to which Winship was addressed.* Nor does the fact that a majority of the States have now assumed the burden of disproving affirmative defenses—for whatever reasons—mean that those States that strike a different balance are in violation of the Constitution."

*Id.*, at 211, 97 S.Ct. at 2327.[3]

When an affirmative defense is not an element of an offense charged and *Win-*ship is not implicated by allocation of burden of proving an affirmative defense, it follows that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction" prescribed by *Jackson v. Virginia* is irrelevant to a review of sufficiency of evidence relating to an affirmative defense. The trier of fact was not called on to view the evidence in the light most favorable to the prosecution in order to find "the essential elements of the crime beyond a reasonable doubt." Rather, its function was to determine whether an accused has proved an affirmative defense "by a preponderance of the evidence." Whatever standard governs appellate review of that determination is not controlled by the Due Process Clause nor required by *Jackson.*

Just as a State is relatively free to provide for affirmative defenses, so also it may test sufficiency of evidence to support them by any reasonable standard of review. Presently *Van Guilder* precludes consideration of any other standard. Once the underpinnings of *Van Guilder* are removed, we may formulate a proper test. Given the increasing number of its followers we should act now.

Because the majority will not reexamine *Van Guilder,* I respectfully dissent.

ONION, P.J., and McCORMICK, J., join.

---

**2.** "Traditionally due process has required that only the most basic safeguards be observed; more subtle balancing of society's interests against those of the accused has been left to the legislative branch. We will therefore not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all elements included in the definition of the offense of which the defendant is charged. Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here." *Ibid.*

**3.** There are, of course, constitutional constraints on how far a State may go in reallocating burden of proof by calling an element of an offense an affirmative defense. *Ibid.* Compare *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).