James Earl **BAKER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–84–00028–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 20, 1984.

Herb Ritchie, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., James C. Brough, Casey O'Brien, Harris County Asst. Dist. Attys., Houston, for appellee.

Before DUGGAN, DOYLE and LEVY, JJ.

**OPINION**

DUGGAN, Justice.

After a jury rejected appellant's defense of insanity and found him guilty of attempted murder, the court assessed his punishment at ten years confinement. Appellant urges six grounds of error on appeal.

The evidence is undisputed both as to appellant's eight-year history of mental illness prior to the offense charged, and as to his conduct on that occasion.

The complainant, Roy Wayne Baker, the appellant's 21 year old brother, testified that on April 4, 1983, he and the 28 year old appellant were alone in their parents' home watching television in the living room in the late morning. Appellant asked Roy if he could see the hunting knife which Roy wore sheathed in a holster on his belt. Roy handed over the knife and appellant sat nearby, opening and closing the weapon for five to ten minutes. He finally closed the knife, placed it on the coffee table, and left the room. Roy then lay down on the living room floor, continued to watch television, and fell asleep. He was awakened when appellant stabbed him with the knife in the stomach. Roy looked up to see appellant standing about two feet from him. Appellant said nothing, walked toward the door, turned and looked back at Roy as he walked out the door, and left the house. With the knife stuck in his stomach, Roy crawled to the telephone and called a neighbor, who came immediately to the Baker home and administered first aid until paramedics arrived and took Roy to a hospital. Following surgery, Roy was hospitalized for more than two weeks.

At about midnight, approximately 12 hours after the stabbing, appellant phoned the Houston Police Department, told them he had stabbed his brother, and asked them to meet him at a restaurant parking lot some four to six miles from his family's home. When the two officers who were dispatched arrived at the parking lot at about 12:30 a.m. April 5th, appellant approached them, identified himself as the person who had called for them, and surrendered himself. The officers took him into custody and waited with him at the restaurant location outside the city limits until a sheriff's deputy arrived and took custody of appellant.

Appellant did not testify at trial, where his defense was limited to the issue of insanity.

In his first two grounds of error, appellant urges that the trial court erred in overruling both his motion for instructed verdict and his motion for judgment non

obstante veredicto because his affirmative defense of insanity "was proven as a matter of law." Because of this legal insufficiency, appellant asserts he is entitled to a reversal and entry of a judgment of acquittal.

In his third ground of error, appellant urges that the trial court abused its discretion in failing to grant a new trial, the trial judge having stated at the conclusion of appellant's motion for new trial hearing that the verdict was against the great weight and preponderance of the evidence. We consider appellant's complaint to be not only that the court abused its discretion, but also that the verdict rejecting appellant's affirmative defense of insanity was against the great weight and preponderance of the evidence, entitling him to a reversal of the conviction and a remand for retrial.

Prior to the creation of the courts of appeals, and their investiture with criminal appellate jurisdiction, a defendant who failed to receive a favorable jury finding on the issue of insanity was restricted on appeal to the Court of Criminal Appeals to the assertion of the ground that he had established his defense as a matter of law. That court was without jurisdiction to entertain a factual challenge that the jury verdict was contrary to the great weight and preponderance of the evidence. *Combs v. State*, 643 S.W.2d 709, 716 (Tex. Crim.App.1982); *White v. State*, 591 S.W.2d 851, 854–55 (Tex.Crim.App.1979).

Under the provisions of the 1980 amendment to art. V, sec. 6 of the Texas Constitution, effective September 1, 1981, the courts of appeals are vested with conclusive authority over all questions of fact presented on appeal. Consistent with that mandate, Tex.Code Crim.P. art. 44.25 (Vernon Supp.1984), likewise effective September 1, 1981, provides that "courts of appeals ... may reverse the judgment in a criminal action, as well upon the law as upon the facts."

■ We interpret this grant of authority to mean, as at least two other courts of appeals have already determined, that we have jurisdiction to consider great weight and preponderance fact questions in cases involving the affirmative defense of insanity. *Van Guilder v. State*, 674 S.W.2d 915 (Tex.App.—San Antonio 1984, no pet.); *Schuessler v. State*, 647 S.W.2d 742 (Tex. App.—El Paso 1983, pet. granted).

■ In passing on a challenge that a jury finding is against the great weight and preponderance of the evidence, the reviewing court is to consider all the relevant evidence presented. If after doing so it determines that the defendant at trial carried his burden of proof as to an affirmative defense and that the jury's verdict was manifestly unjust, the reviewing court has the duty to reverse the trial court judgment and remand the case for new trial, regardless of whether the record contains some evidence of probative force in support of the verdict. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ Insanity is an affirmative defense upon which the defendant has the burden of proof by a preponderance of the evidence. Tex.Penal Code Ann. sec. 8.01(a) and sec. 2.04(d) (Vernon Supp.1984); *Graham v. State*, 566 S.W.2d 941, 943 (Tex. Crim.App.1978). It is not necessary for the state to present expert medical testimony that a defendant is sane in order to counter defense expert witnesses, and lay witness testimony may be accepted over that of experts. *Graham, supra.* However, with the establishment of factual review authority in the courts of appeals, if the affirmative defense of insanity is raised by credible evidence, the state must either negate the defense or risk the establishment of the defendant's burden of proof either as a matter of law or as a matter of fact, *i.e.*, by the great weight and preponderance of the evidence. Tex.Penal Code art. 2.04(d); *Van Guilder*, 674 S.W.2d 915; *Schuessler*, 647 S.W.2d 742; *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660.

The defense introduced medical records showing appellant's eight-year course of hospitalization and treatment for severe mental illness beginning in 1975, including

four admissions to the Harris County Psychiatric Hospital and five periods of treatment at Austin State Hospital, interspersed with treatment at Harris County Mental Health and Mental Retardation Authority (MHMR) outpatient programs and the facilities of the Texas Research Institute for Mental Science in Houston. Appellant was diagnosed on every entry and discharge report as paranoid schizophrenic. Typical of hospital summary sheets introduced was the Austin State Hospital admission diagnosis of January 4, 1980, upon the third of appellant's five admissions there:

> [H]istory of severe paranoid schizophrenia symptoms since age 21. He has been hospitalized on numerous occasions, responds fairly well to medication but does not continue outpatient treatment ... [Diagnosis:] Schizophrenia Paranoid Type.

The state agreed with a summary in appellant's brief of the findings of the appellant's hospital records:

> Voluminous records were entered into evidence which documented Appellant's treatment at four different mental institutions. Hospital summary sheets, read into evidence, revealed that Appellant was plagued by voices and hallucinations, that he screamed, laughed or cried at totally inappropriate times, and that he believed himself to be God.

Mr. Rob Olsen, appellant's clinic caseworker, testified that appellant was first admitted to the MHMR's Northwest Clinic in September 1975, and had attended the clinic "off and on" for eight to nine years; that he first became appellant's caseworker in November 1979; that at the time of the stabbing, appellant had been enrolled for about one year, or since May 1982, in the clinic's "day hospital program," a 2½ hour-per-day, four-day-a-week program for "chronic, high risk patients" who, if they did not receive such clinic treatment, would likely require a hospital setting at some point. The program provided group therapy, recreation, exercise, and medication (appellant was on a "relatively high" dosage of Haldol, a tranquilizer).

Olsen observed appellant's behavior over a 3½ year period, both during individual counseling and therapy sessions and while appellant was in the waiting area. Appellant typically showed one of two types behavior: quiet and withdrawn, or angry. Appellant's moods could change rapidly and Olsen had seen appellant have unprovoked verbal outbursts on some 20 to 30 occasions. Appellant was delusional and subject to hallucinations, and Olsen observed him on occasions talking to a tatoo on his hand, and many times simply sitting alone talking to himself. He would "temporarily get anxious in situations where he didn't have a real day-to-day familiarity with something," such as when he was uncomfortable about his sister coming to visit the family and "took off" to El Paso for two to three weeks.

While records showed that appellant last appeared at the clinic March 22, 1983, 13 days before the stabbing incident, Olsen was "pretty certain" he was there later than that. Although appellant was one of the four or five "most severely ill" of his 40 or 50 patient caseload, Olsen never saw appellant do violence to other persons or destroy property, and he could not say that there were occasions when appellant did not know the difference between right and wrong.

Dr. John Nottingham, the psychiatrist who examined appellant on April 26, 1983, on the court's order, testified that he determined from the examination that appellant was a paranoid schizophrenic; that without reviewing medical history records he was unable to determine, based on his 45-minute to one-hour interview, whether appellant was sane or insane at the time of the offense; but that he determined that appellant had no delusional or bizarre thinking or disturbed belief systems at the time of his interview, and was competent to stand trial. Later, based on both his interview examination and his review of appellant's current outpatient clinic records, Dr. Nottingham concluded that

> the medical probability is that on the date of the alleged offense, that [appel-

lant] was exhibiting a significant mental illness, and that mental illness directly affected his ability to appreciate the wrongfulness of the alleged activity with which he's charged, and that in my opinion, he was legally insane at the time of the alleged offense.

Because Dr. Nottingham felt that appellant did not have the ability to appreciate the wrongfulness of the alleged criminal activity, he did not feel it necessary to pursue whether appellant was able to conform his conduct to the law's requirements. Nottingham believed that appellant realized what he had done after he did it, and "was aware that it was wrong after he did it," consistent with his contacting the police to turn himself in. Concerning appellant's account of the day of the stabbing, Dr. Nottingham testified: "He said that day he had been upset, ... he believed the reason he was upset was that transportation that was supposed to pick him up to take him to the clinic didn't show up, and that's all he could give as a reason for stabbing his brother;" and "he stated after he did it that he ran down the street, because he was 'scared I hurt him'; that he ended up at ... Aunt B's Kitchen where he phoned the police and surrendered."

Dr. Seth Silverman, medical director of the MHMR Northwest Medical Clinic day hospital, and appellant's treating psychiatrist for about one year prior to the stabbing, also testified that appellant was insane at the time of the offense. He testified that appellant was a "chronic schizophrenic, probably paranoid type," and "one of the most severe cases"; that it was "entirely consistent" that such a person would act wrongly and realize only afterward that what he had done was wrong.

Appellant was in the day care program before Silverman arrived at the clinic, and Silverman came to know him "probably a lot better than most of the cases." He and another psychiatrist with patient placement responsibility decided appellant would do well in the day hospital, the clinic's most intensive program for its "highest risk" patients, and he was placed there. He was kept medicated on "pretty heavy doses" of Haldol, a tranquilizer, with Cogentin to control side effects, but even then he would sit and talk to himself. "He yells to himself ... he has lots of anger and a lot of hurt inside of him." Silverman testified that appellant has had depression since 1975; that he hears voices that "really upset him"; that appellant "does not process pain and understand pain the same way we do," but responds to internal stimulants, and "doesn't process what's going on outside of him as the rest of us do"; that he used to come in with second or third degree burns between his fingers because "he would sit there with his cigarette and forget it was burning"; and that Silverman worried that appellant would get a bone infection. He testified that appellant "interphases reality" on a superficial level, and "at times can happen to have coherent conversations where he understands what is going on but at the same time he's fighting off a lot of things inside of himself ...." Silverman was told [and he believed] that appellant "got angry at his mother and ripped the skin off his arm because he was so angry at her."

Silverman testified that the caseworkers in the clinic "were absolutely frightened of him. They didn't want to come near him, didn't want him in the day hospital because they were scared he couldn't obey rules"; and that "I thought we needed to try and help him as much as we could, so we tolerated some of that behavior ... because he was an unusual case ... I don't know if it's stupidity or bravery on our part to keep him in the day hospital." He testified that it was entirely consistent with chronic paranoid schizophrenia that appellant might do an act and not know it was wrong, and then at some very short time afterward, realize it was wrong and possibly even apologize; that "[p]art of the illness is intransiotic psychotic state and rarely is anybody totally psychotic all the time or totally with it all the time."

Silverman testified that at the time of the stabbing, appellant did not understand that what he was doing was wrong, and

that because of his mental disease, he could not control his actions, and even if he knew they were wrong, "I don't believe he would be able to control his actions." Dr. Silverman testified that appellant "is not capable of premeditated rational thought," and he is "pretty sure that what [appellant] did was not directed at his brother or planned to hurt him." Silverman testified that his impressions and medical opinion were based on "an extensive history and a lot of interaction with him. . . . This isn't seeing him for two weeks, three or four times, this is over a period of months to years and a lot of different settings and getting feedback from a lot of people." Accordingly, he felt "real certain" about his diagnosis.

Appellant's mother, Evelyn Jeanette Baker, in whose home he lived, testified that his behavior changed when he came back from military service in Korea in 1974; that he was a totally different person who "didn't care about anything anymore, life or anything else"; that when he first came home, he had a little bag with broken pieces of glass that he said were diamonds; that when she disputed it, he went out to the street and began hitting his head on the curb; that when she once put her hand on his face and said she loved him, he told her, "don't touch me, don't ever touch me again"; that he would sit in his room talking to himself, but would deny it when questioned; that his eating and sleeping became erratic; that when he would go to the Austin State Hospital for two to three months, he would return seeming better, but it would be "the same thing over again shortly"; that she believed he had a mental disease or defect since returning from the service in Korea; that she believed he did not know right from wrong and was unable to conform his conduct to the law's requirements; that the family had "tried so many times to have him put—to take him somewhere and take care of him so that he wouldn't hurt anybody but that they would send him to Austin and keep him there for about three months, and they would let him come back home. . . ."

Appellant's 24 year old brother, John Wesley Baker, who also lived at the family home, recounted appellant's threats to the family and his hitting his head against the curb. He testified that it was his opinion that his brother suffered a disease of the mind that prevented him from knowing right from wrong at the time his other brother was stabbed, and that appellant was unable at that time to conform his conduct to the law's requirements.

Appellant's 24 year old married sister, Jana Baker Mijares, who did not live in the family home, testified that appellant was mentally ill; that he "paces the floor and talks to himself and talks to his arm and is mean"; that she has seen him "stand real close to the fire and catch his shirt on fire," and that his condition varies from time to time and "sometimes he seems better." When she testified as to his mental state at the time of the stabbing, "I don't know if he knew it was wrong or right. I don't know," appellant's counsel pleaded surprise and sought to impeach her based on personal conversation shortly before; however, the court denied permission.

Roy Baker, the appellant's 21 year old brother and the complainant, testified that when appellant came back from the service in 1975, "he wasn't James no more"; that he "used to bang his head up against the curb"; that the family would try to care for him; that "he used to say that he was God and I couldn't die"; that appellant told him about his conversations with "little people"; and that he would walk around the house talking to himself, screaming sometimes, throwing things, with violent spontaneous outbursts of anger. Roy Baker testified that appellant would curse and threaten to get a gun and shoot their father without any provocation, and that he was afraid of appellant "in a way," but not afraid "in another way, no, because . . . he never showed any harm to anybody. But then, on the other hand, seeing him and the way he is, it kind of had me worried." On the day of the stabbing, Roy testified that he and appellant had been watching television during the morning; that although appellant had told their father previously that he wanted to be an only child, and

"hated all the rest of the kids," there had not been anything said that day; that appellant had no motive or reason to want to hurt him; and that he was surprised "very much so" to wake up with a knife in his stomach.

The state's brief points out that Roy Baker, when asked if he had an opinion as to whether appellant was incapable of conforming his conduct to the law's requirements on the date of the stabbing, answered, "No, I wouldn't know that," and changed his answer only after he was impeached with his contradictory pretrial affidavit. However, before that question and answer, he had answered to the contrary virtually the same question:

Q. On the date that you were woke up with a knife in your stomach, you think that because of this mental disease or defect, he was incapable of conforming his conduct to the requirements of the law?

[PROSECUTOR]: I will object.

THE COURT: If he knows, he can answer.

A. (By the witness) yes, sir.

Q. You believe he was incapable?

A. He, you know, sometimes he does realize that, you know. He can stay out of trouble. He can stay out of trouble from the law at some times and then other times, you know, he can't.

Q. He's not able to?

A. Yes.

In summary, two psychiatrists, appellant's mother, and one brother all testified unequivocally, tracking the statutory elements of Penal Code sec. 8.01, that appellant was insane at the time of the offense. While the complainant Roy Baker's testimony was equivocal as to whether appellant knew right from wrong at the time of the offense, and appellant's sister and Mr. Olsen, the caseworker, testified that they did not know, each of these three strongly corroborated the long term nature and severity of his mental illness.

The state's rebuttal witnesses, the four officers who together or successively had custody of appellant for the two- to three-hour period after his arrest, beginning 12 hours after the stabbing, necessarily confined their testimony to the facts of appellant's behavior in their presence. This behavior, they uniformly testified, was normal and unremarkable.

The state suggests that the facts of our case are similar to those of *Williams v. State*, 653 S.W.2d 574 (Tex.App.—Tyler 1983, pet. ref'd), and likewise require affirmance. There, as here, the state presented no medical evidence to rebut the testimony of Dr. Nottingham, who based his opinion of Williams' insanity on a post-incident examination and a review of prior medical records. The *Williams* opinion noted that Dr. Nottingham consulted with treating psychiatrists as well. However, prior medical records were not introduced in *Williams*, and the only other defense evidence shown was the testimony of Williams' mother that he suffered a "mental illness" since his army discharge seven years earlier, and had been "in and out" of the Veterans Administration Hospital, sometimes staying there three to four weeks. In *Williams*, unlike our case, the state presented the testimony of lay witnesses who had been with the defendant and observed his normal speech and demeanor on numerous occasions both in recent weeks, and in the immediate hours, before the offense. By contrast, eight years of medical records and the testimony of appellant's clinic caseworker, his treating psychiatrist, and four family members proved undisputedly the severity of his chronic mental illness and previous psychotic conduct; two psychiatrists and three lay witnesses testified to his insanity at the time of the offense. *Williams* and the instant case are thus distinguished by the volume and nature of evidence showing appellant's insanity.

■ The appellant's evidence of insanity was disputed vigorously on cross-examination of the defense witnesses. Further, the state's four witnesses offered testimony of normal behavior after the incident which

the jury was entitled to consider. Accordingly, we overrule appellant's "no evidence" arguments in grounds of error one and two. However, based on the above review and weighing of the evidence, we find that the jury's finding that appellant was not insane was so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellant's third ground of error is sustained.

Because the matters complained of in appellant's remaining grounds of error will necessarily recur upon any re-trial of the case, we next consider them.

Appellant's fourth ground of error contends that the trial court erred in refusing his requested instruction regarding intent to kill, and thus omitted the essential element of specific intent to kill from the definition of attempted murder.

Appellant requested, and the court refused, the following instruction in the charge:

You are instructed that an intent to kill is an essential element of the offense of attempt to commit murder. And also unless you find from the evidence beyond a reasonable doubt that at the time the defendant stabbed Roy Wayne Baker, if he did, the defendant had the specific intent then and there to cause the death of the said Roy Wayne Baker, or if you have a reasonable doubt as to whether he had the specific intent to so cause the death of the said Roy Wayne Baker, you cannot convict the defendant of attempted murder. In such event, you will acquit the defendant of attempted murder.

Section 19.02(a) of the Tex.Penal Code Ann. (Vernon 1974) provides that a person commits an offense if he intentionally or knowingly causes the death of an individual. Criminal attempt is defined in sec. 15.01(a) of the Penal Code as follows:

A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended.

The offense of attempted murder, for which appellant was indicted and tried, is created by the coupling of these two sections.

The court charged the jury on the offense of attempted murder as follows:

## II.

Our law provides that a person commits murder if he intentionally or knowingly causes the death of an individual.

## III.

A person commits an offense if, *with specific intent* to commit an offense, he does an act amounting to more than mere preparation that tends, but fails, to effect the commission of the offense intended. So, a person commits the offense of attempted murder if, *with specific intent to unlawfully cause the death of another*, he does some act amounting to more than mere preparation to commit murder that tends, but fails to effect the commission of such offense.

[Here were set out Penal Code sec. 6.03(a) and (b) definitions of "intentionally" and "knowingly."]

. . . .

Now, if you find from the evidence beyond a reasonable doubt that on or about April 4, 1983, in Harris County, Texas, the defendant, JAMES EARL BAKER, did then and there unlawfully attempt to cause the death of ROY WAYNE BAKER, by intentionally cutting or stabbing ROY WAYNE BAKER with a deadly weapon, namely, a knife, *having intent to commit murder*, then you will find the defendant guilty of attempted murder.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of attempted murder and say by your verdict not guilty. (Emphasis added).

The charge submitted clearly sets out the requisite intent to kill, and requires both a finding of an attempt by appellant to cause the death of Roy Wayne Baker

and a finding that the attempt was intentionally made in order to justify a conviction. Further, attempt implies both an intent and an active effort to carry out or consummate the intent or purpose. *Robinson v. State,* 630 S.W.2d 394, 398 (Tex.App.—San Antonio 1982, pet. ref'd). Appellant's fourth ground of error is overruled.

Appellant's fifth and sixth grounds of error assert that the trial court erred (1) in allowing his extrajudicial confession to be used before the jury since the state did not prove that such statements were voluntarily made, and (2) in failing to make express findings of fact and conclusions of law on the issue of the voluntariness of appellant's confession. Appellant also asks that this appeal be abated and remanded to the trial court to make findings of fact and conclusions of law as required under Tex.Code Crim.P.Ann. art. 38.22, sec. 6 (Vernon 1979).

Article 38.21 of the Code of Criminal Procedure provides that:

> A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed.

Additionally, art. 38.22, sec. 5 provides that:

> Nothing in this article precludes the admission of a statement made by the accused ... *that does not stem from custodial interrogation,* or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law. (Emphasis added).

Before trial, counsel for appellant requested that any statements made by appellant at the time of his arrest be excluded as not knowingly and voluntarily made due to his insanity. When, during trial, the state called one of the arresting officers, Officer Gaines, defense counsel objected regarding the voluntariness of appellant's anticipated statements, and the trial judge removed the jury.

Gaines testified out of the jury's presence that he first encountered the appellant as the latter was walking toward the patrol car; that he asked appellant if he was the one who had called the police and what the problem was; that appellant answered "that he had thought he had killed his brother" when he stabbed him after an argument; and that appellant was not under arrest or in custody at this point.

On cross-examination, defense counsel questioned Officer Gaines as to appellant's appearance and demeanor at this time. Gaines testified that the appellant appeared nervous, that he appeared to understand what he was saying, and that he, Gaines, observed nothing that would lead him to form an opinion that appellant was not of sound mind. Defense counsel renewed his objection, which was overruled by the court with the reservation that the state question Gaines only as to what the appellant said at this point and avoid any testimony about events subsequent to his arrest.

Art. 38.22, sec. 5 specifically excludes from its provisions "a statement that does not stem from custodial interrogation." *Lindley v. State,* 635 S.W.2d 541, 544 (Tex.Crim.App.1982); *May v. State,* 618 S.W.2d 333, 348 (Tex.Crim.App.1981). Appellant's statement to the arresting officers was not the product of a "custodial interrogation," as that term is defined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because he was not under arrest or in custody. The two questions the officers directed to appellant were not words they should have known were reasonably likely to elicit an incriminating response.

While appellant's mental state is relevant to the jury's determination of the accuracy of his pre-arrest admission, it is not determinative of its admissibility. Appellant may have been mentally disturbed at the time of his admission or confession, but the compulsion influencing his admission was internal and not that of custodial interrogation. Tex.Code Crim.P.Ann. art.

38.21 (Vernon 1979); *Schuessler*, at 647 S.W.2d at 747.

Appellant's statement does not come within the ambit of art. 38.22, and there was no need for the court to file findings of fact and conclusions of law respecting the voluntariness of appellant's confession as mandated by that article's sec. 6. No abatement and remand to the trial court for findings is necessary. Appellant's fifth and sixth grounds of error are overruled.

The judgment is reversed and the cause remanded.