COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-311-CR

 

 

LEE THOMAS BUTLER                                                          APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.  Introduction








Appellant Lee Thomas Butler
appeals his conviction and nine-year sentence for aggravated assault with a
deadly weapon.  In his first point,
appellant contends that the trial court committed reversible error by failing
to charge the jury on the lesser-included offense of assault with bodily
injury.  In appellant=s second and third points, he complains that the evidence is factually
insufficient to support a guilty verdict and a deadly weapon finding.  We affirm.

II.  Background Facts

On September 22, 2003, at
approximately 12:00 p.m., Robby Trevino and his wife, Laurie Reed, were in
downtown Fort Worth, Texas to go to lunch. As they were walking down Third
Street, Trevino noticed an apple on the sidewalk.  Then appellant walked up to the apple and
stepped on it, splattering Reed=s dress and hair with chunks of apple. 
Trevino began yelling at appellant. 
Although appellant=s version of
what happened next differs from Trevino=s and Reed=s, all agree
that appellant stabbed Trevino.  After
the stabbing, Trevino saw the knife in appellant=s hand.  When the police
searched appellant, he had a wallet and credit cards that belonged to another
person whom appellant admitted he did not know.

Appellant was indicted for
two counts of aggravated assault with a deadly weapon.  Count one charged appellant with assaulting
Trevino, and count two charged him with assaulting Reed.  On July 27, 2005, the jury found appellant
guilty of count one, assaulting Trevino, and found appellant not guilty of
count two, assaulting Reed.  On July 29,
2005, the trial court assessed his punishment at nine years in the
Institutional Division of the Texas Department of Criminal Justice. 








 

 

III.  Factual Sufficiency-Affirmative Defense of
Insanity

In appellant=s second point,[2]
he contends that the jury=s rejection
of his affirmative defense of insanity is so against the great weight and
preponderance of the evidence as to be manifestly unjust.








A.  Applicable Law

Penal code section 8.01(a) provides that a person is insane if Aat the time of the conduct charged, the actor, as a result of severe
mental disease or defect, did not know that his conduct was wrong.@  Tex. Penal Code Ann. ' 8.01(a) (Vernon 2003). 
Although jurors may not arbitrarily disregard expert testimony as to
insanity, neither may they give conclusive effect to such testimony.  Graham v. State, 566 S.W.2d 941, 951
(Tex. Crim. App. 1978).  The
circumstances of the crime itself are also important in determining the mental
state of the accused at the commission of the offense.  Id. at 951.

B.  Standard of Review








Insanity is
an affirmative defense to prosecution.  Tex. Penal Code Ann. ' 8.01(a).  The defendant has the
burden of proving an affirmative defense by a preponderance of the
evidence.  Id. ' 2.04(d) (Vernon 2003).  

Therefore, upon review of
this point, we must consider all the evidence relevant to the issue of insanity
and determine whether the verdict is so against the great weight and
preponderance of the evidence as to be manifestly unjust.  Meraz v. State, 785 S.W.2d 146, 155
(Tex. Crim. App. 1990).  In our review,
we may not usurp the function of the jury by substituting our judgment in the
place of its verdict.  See id. at
154.  We may only sustain this point if,
after detailing the relevant evidence and stating in what regard the contrary
evidence greatly outweighs the evidence supporting the verdict, we also clearly
state why the verdict is so against the great weight of the evidence as to be
manifestly unjust, why it shocks the conscience, or why it clearly demonstrates
bias.  Id. at 154 n.2; see
Clewis v. State, 922 S.W.2d 126, 135-36 (Tex. Crim. App. 1996).

C. Analysis

It is undisputed that
appellant is a paranoid schizophrenic and that at the time of the stabbing, he
had a severe mental disease or defect.  The
issue here is whether, as a result of his paranoid schizophrenia, appellant
knew stabbing Trevino was wrong.








Trevino testified that he and
Reed were walking eastbound on the north side of Third Street when they
encountered appellant.  Before appellant
stomped on the apple, he had been laughing and joking with another man who
disappeared.  Trevino couldn=t say whether appellant=s eyes were Acrazy
looking@ after appellant stepped on the apple and confronted Trevino,  but Trevino said that appellant did appear to
be mad.[3]  Just before appellant stabbed Trevino, he Aput his head around [Trevino=s] head leaning his shoulder into [Trevino]@ as if he were going to put his head on Trevino=s shoulder.[4]  Trevino testified that after the stabbing, he
pretended he had a weapon.  Although
appellant did not seem to demonstrate any fear or concern before stabbing
Trevino, he did appear scared when Trevino acted as if he had a weapon. 

Trevino also testified that
he has some experience with mental illness because one of his children is
borderline schizophrenic and has manic episodes.  In Trevino=s opinion, appellant knew what he was doing when he stabbed Trevino
and knew that his actions were wrong. 








Reed testified that when
appellant confronted Trevino, he stared right at him and looked angry.  Reed said that after appellant stabbed
Trevino, he turned to her and, with the knife in his hand, said AI will kill you too.@  She also said that after the
stabbing, appellant walked backwards across Third Street with the knife still
in his hand up in the air about head level. 
On cross-examination, Reed admitted she had told the police in her
statement that appellant Ahad crazy
looking eyes darting out everywhere . . . . 
[H]e looked like he was looking to see who was going to try to tackle
him for his knife.@ 

David Whitney did not witness
the stabbing, but he did see what happened afterward.  He testified that appellant was wandering
back across Third Street, and people were getting out of his way.  According to Whitney, appellant was just
carrying the knife and did not appear to be threatening anyone with it.  Whitney=s friend Tucker Davis got appellant to the ground.  Trevino had come back toward appellant at
that point and was yelling at him. 
Appellant was talking Anonstop,@ and Whitney
thought he was acting Akind of
crazy.@








Davis testified that when he
saw appellant, appellant was walking eastbound on the south side of Third
Street and then decided to turn northbound to cross the intersection at Third
and Houston Streets.  Davis walked up
behind appellant, and appellant sensed that Davis was there.  Appellant turned around with the knife out
and said, A[D]o you
want a piece of me?@  Davis told appellant he just wanted to
talk.  He also told appellant that he was
a black belt in tae kwon do and said he would harm appellant if appellant did
not give him the knife.  Appellant was
not being aggressive; he seemed to calm down. 
Appellant then let Davis take the knife. 
He looked Davis in the eye and calmly asked if Davis was a police
officer, but Davis did not answer.

Davis put appellant on the
ground to wait for a police officer. 
Appellant did not fight or struggle. 
When Trevino came over, he and appellant yelled at each other, and
appellant began to talk rapidly.  Davis
explained that he might have told the police that appellant was Apsychobabbling@ because he
was talking so fast.  Davis sensed that
appellant was still very angry with Trevino and it did not help that Trevino
was yelling at him.  It appeared the two
were having an understandable conversation.








Terry Briggs, a City Center
security officer, testified that when he responded to the disturbance, Davis
had the knife with blood on it, so Briggs handcuffed appellant.  He asked appellant if he had any more
weapons, and appellant answered A[a] very clear no without any hesitation.@  Briggs testified that
appellant and Trevino were both agitated and were having a heated conversation,
but appellant was not rambling.  He did
not appear crazy or insane, just agitated. 

Tami Robinson, a Fort Worth
police officer testified that when she responded to the scene, appellant was
attempting to explain his actions to anybody who would listen. 

Detective James Desmarais,
also with the Fort Worth police department, testified that he interviewed
appellant after the stabbing.  Appellant
admitted being in the downtown area and stepping on the apple, but he denied
getting any of it on anyone.  According
to Detective Desmarais, appellant appeared to understand his Miranda
rights.  Appellant told Detective
Desmarais that Trevino cussed him and used bad language, so appellant started
walking towards him.  He said Trevino
started backing away, and appellant thought he was reaching for a weapon, so he
stabbed him for fear of his safety. 
Appellant did not tell Detective Desmarais that he had met Trevino and
Reed before or that Trevino had previously threatened appellant. 








Detective Desmarais said that
all of appellant=s answers
were coherent and appropriate, and they were having normal conversation and eye
contact.  Then, appellant=s demeanor changed, he broke off the eye contact, turned to the left,
and started having a conversation for about twenty seconds or so with someone
who was not there.  Appellant then went
back to normal.  He told the detective
that he was supposed to be on medication, but he was not taking it.  After appellant=s conversation with an imaginary person, Detective Desmarais
terminated the interview.

Appellant testified that he
took Prolixin but that he had been off his medication for about two months when
he arrived in Fort Worth.  According to
appellant, he saw Trevino earlier on September 22 in line at First United
Methodist Church where they give away free lunches.  Appellant testified that he and Trevino
argued, but nothing else happened. 
Appellant said that he ate his lunch on one of the benches off
Throckmorton and that he was by himself. 

According to appellant, when
he finished his lunch, he crossed the street. 
He had an apple in his hand, and it rolled out of his hand.  A woman asked appellant if he tried to hit
her with the apple, and he said no. 
Appellant testified that the woman told him Trevino and Reed were
talking to him, then he smashed the apple. 
Appellant said the apple was right underneath his foot, and nothing got
on Reed or Trevino; they were three or four feet away.  According to appellant, Trevino used
profanity, and Trevino and Reed started circling him.  Appellant testified that Trevino came toward
him, put his hands in his pocket, and said he would kill appellant.  When Trevino took his hands out of his
pocket, there was nothing there, but appellant had already stabbed Trevino by
then. 








Appellant said he did not
mean to hurt Trevino and he was just trying to defend himself.  He also said that he did not try to run away
afterward.  He gave Davis the knife
because he thought Davis was a police officer; although Davis did not answer
when appellant asked him if he was an officer, appellant said that Davis moved
his head as if to say yes. 

Appellant testified that he
did not think he did anything wrong that day. 
In response to cross-examination, appellant admitted that it would have
been wrong to start a fight with Trevino if he had been in the lunch line at
the church, to throw the apple on the woman on the street, and to have stabbed
Trevino if Trevino had not threatened him first, as appellant believed. 

Appellant did not remember
telling Detective Desmarais that he walked toward Trevino first, that he turned
to face Reed because he doesn=t like women disrespecting him, or that he had a conversation with an
imaginary person.  Appellant acknowledged
that he and the detective were the only people in the room during the
interview. 








Several of appellant=s family members testified that he has a long history of mental
illness and that he would act bizarrely and sometimes violently when off his
medication.  For instance, several
testified that they had seen appellant in the front yard dressed in Aarmy clothes@ and acting
as if he were a soldier.[5]  They also testified that appellant traveled a
lot, especially when he was off his medication, and that they did not see him
consistently.  

Appellant=s brother testified that appellant Adoesn=t always act
. . . as though he know[s] who you are@ when he is off his medication and that he has in the past, when off
his medication, acted as if he knew someone when he did not or described things
that happened to him that were not true. 
According to appellant=s brother, when appellant is off his medication, you can talk to him,
but he does not act rationally.  For
instance, one time appellant set a fire in the middle of the floor in his
apartment because he was cold, even though he had a heater.  Appellant did not seem to understand why his
actions were inappropriate. 








Appellant=s sister testified that when she saw appellant in jail after the
stabbing, he was still a little disoriented even though he was taking
medication.  He told her that Athey were picking on him and he just had to defend himself.@  Appellant told his sister that
he had been at a shelter and a man told him he was going to kill him and
reached for his back pocket; appellant thought the man was going to get a
weapon, so appellant pulled his knife. 
Appellant=s sister
said that when appellant was off his medication, he talked to people who weren=t there and didn=t seem to
know he was doing anything wrong. 
Another of appellant=s sisters testified that appellant did not think any of the strange
things he did were wrong. 

Dr. Lisa Clayton, a
psychiatrist, testified that she examined appellant to determine if he was sane
at the time of the offense.  She stated
that she interviewed appellant on November 6, 2004.  Dr. Clayton testified that when she saw
appellant, he was on antipsychotic medicine and appeared to be rational and lucid.  After reviewing appellant=s medical records, Dr. Clayton stated that she believed appellant had
been hearing voices in the past before he was given medication for his
schizophrenia.  She testified that she
did not believe that appellant knew that stabbing Trevino was wrong and that
she believed all of appellant=s actions were consistent with that opinion.  Dr. Clayton stated that she believed that
appellant was under the Aparanoid
delusional belief that [Trevino] was trying to kill him.@  She testified that appellant
thought that he was defending himself against Trevino and that he was
delusional.  According to Dr. Clayton,
appellant could appreciate right from wrong but not in connection with his
actions toward Trevino because he was delusional about Trevino; in other words,
he truly believed he was acting in self-defense. 








Dr. Clayton believed that
appellant=s actions
after the stabbing likewise did not indicate a consciousness of guilt; she
believed that appellant simply thought that once he negated Trevino as a
threat, he left the area.  In forming her
opinion, Dr. Clayton did not speak with the officers or other witnesses; she
based her opinion on her interview with appellant, her review of his medical
records and the police report, and a five to ten minute interview with one of
appellant=s jailers. 

Dr. Stephen Karten, a
clinical psychologist and the State=s expert witness, testified that he believed appellant was sane at the
time of the offense.  Dr. Karten
explained how he recreated the scene to help him make inferences about
appellant=s state of
mind at the time of the stabbing.  In
forming his opinion, Dr. Karten reviewed the police report, Trevino=s medical records, the indictment, psychological evaluations of
appellant evaluating his competency to stand trial, and Dr. Clayton=s report.  He also interviewed
appellant, some of appellant=s brothers and sisters, Trevino, Detective Desmarais, and appellant=s mother. 








Dr. Karten prepared a table
with appellant=s actions on
one side and a description on the other side of the inferences of appellant=s awareness of right and wrong that could be made from those
actions.  He pointed to appellant=s stabbing Trevino, his attempted flight, and his possessing another
person=s wallet and credit cards when he was arrested as evidence that he was
sane.[6]
According to Dr. Karten, appellant=s actions showed a high degree of good judgment because on the street Ayou get them before they get you.@  Dr. Karten agreed that
appellant=s leaning
into Trevino before stabbing himCwhich the prosecutor characterized as appellant seeming to be hiding
the fact that he was getting out the knifeCis consistent with his determination that appellant was sane because
it shows planning and an awareness of taking someone by surprise.  Appellant did not tell Dr. Karten that he had
argued with Trevino earlier at the church. 
Dr. Karten said that appellant Aknew what he was doing [was] wrong and [that] there was a consistent
sense of justifying his behavior.@ 

Appellant contends that Dr.
Karten agreed that appellant might not have known right from wrong because he
did not run away after the stabbing as Dr. Karten had assumed.[7]  However, even though Dr. Karten agreed that
the fact that appellant walked away instead of running Atinkers@ with his
assessment a little, he nevertheless stated that he believed appellant was sane
at the time of the assault.








Appellant points to the
testimony of his family and Dr. Clayton, and to Dr. Karten=s admission that it would Atinker@ with his
opinion if appellant had not attempted to run away, to support his contention
that the evidence is factually insufficient to support the jury=s rejection of his insanity defense. 
However, after reviewing the evidence, we cannot say that the verdict is
so contrary to the great weight and preponderance of the evidence that it is
manifestly unjust.  See Meraz, 785
S.W.2d at 155.

The witness testimony
regarding appellant=s behavior
before and after the stabbing is as consistent with a finding that appellant
was sane as with a finding that he was insane.[8]  For example, Trevino and Reed both testified
that appellant was the initial aggressor; Trevino, Whitney, and Davis testified
that appellant was leaving the scene even though he was not running, indicating
consciousness of guilt; appellant was initially aggressive with Davis[9]
until Davis told him he was a black belt and threatened to harm him; appellant
asked Davis if he was a police officer and complied when he thought Davis
indicated that he was; and appellant omitted his version of the facts when
talking to Detective Desmarais and Dr. Karten.








Additionally, although both
experts agreed that appellant was suffering from a mental disease or defect at
the time, they disagreed over his awareness of right and wrong.  Appellant=s argument that Dr. Karten=s opinion should be given less weight because he assumed that
appellant ran away when he did not fails to take into account testimony that
appellant was leaving the scene with the knife in his hand even though he was
not running.  A reasonable inference from
Dr. Karten=s testimony
is that although appellant did not Arun@ away, Dr.
Karten still believed that appellant=s leaving the scene showed an intent to flee.

Appellant contends that the
facts of this case are similar to the facts in the following cases:  Van Guilder v. State, 674 S.W.2d 915
(Tex. App.CSan Antonio
1984), aff=d, 709 S.W.2d 178 (Tex. Crim. App. 1985),[10]
cert. denied, 476 U.S. 1169 (1986); Baker v. State, 682 S.W.2d
701 (Tex. App.CHouston [1st
Dist.] 1984), rev=d, 707 S.W.2d 893 (Tex. Crim. App. 1986);
and Ex parte Schuessler, 846 S.W.2d 850 (Tex. Crim. App. 1993).  According to appellant, those cases stand for
the proposition that Awhen
everyone basically says that a person is insane, the evidence is insufficient
for conviction.@ 








Although the court of
criminal appeals affirmed the intermediate appellate court=s opinion in Van Guilder, it disapproved of its use of a
factual sufficiency standard of review on the ground that the intermediate
appellate courts of this state do not have jurisdiction to consider the factual
sufficiency of the jury=s rejection
of an affirmative defense.  Van
Guilder, 709 S.W.2d at 180-81, 183. 
It reversed the intermediate appellate court=s holding in Baker on the same ground.  Baker, 707 S.W.2d at 894.  But the court of criminal appeals later
rejected those holdings in Meraz, which mandates the same standard of
review employed by the intermediate appellate courts in Van Guilder and Baker.  785 S.W.2d at 155.  Thus, those cases are instructive; however,
we find them distinguishable.

In Van Guilder, the
defense offered the testimony of five medical experts who all agreed that the
appellant was insane on the date of the offense, but the State offered no
evidence to rebut the appellant=s insanity claim.  709 S.W.2d at
179.  In addition, the prosecutor told
the trial court on the record, outside the jury=s presence, that a psychiatrist hired by the State had agreed with the
defense experts that appellant was insane when she committed the offense.  Id. at 182.








In Baker, two
psychiatrists hired by the defense, the appellant=s mother, and one of his brothers all testified unequivocally that the
appellant was insane at the time of the offense.  682 S.W.2d at 708.  The State offered the testimony of four
officers regarding appellant=s behavior after his arrest but did not offer any medical
testimony.  Id.

In Ex parte Schuessler,
a post-Meraz opinion, the court of criminal appeals vacated its judgment
reversing the opinion of the El Paso Court of Appeals, which had determined
that the evidence was factually insufficient to support the jury=s rejection of the appellant=s affirmative defense of insanity. 
846 S.W.2d at 853.  In Schuessler
v. State, the defense Aproduced overwhelming evidence of insanity,@ which the State rebutted with the testimony of two jailers regarding
appellant=s behavior
three months after the offense and an expert who Acredited the testimony of [the defense] witnesses[,
and] . . . . diagnosed [the appellant=s] condition as one of acute psychosis, prior to, contemporaneous
with, and antecedent to the murder [, but
who] . . . withheld . . . any conclusion as to legal insanity
at the moment the act was committed.@  647 S.W.2d 742, 749 (Tex. App.CEl Paso 1983), rev=d, 719 S.W.2d 320 (Tex. Crim. App. 1986)
(op. on reh=g).

Here, the State offered
evidence regarding appellant=s behavior at the time of the offense in addition to medical
testimony.  Thus, Van Guilder, Baker,
and Schuessler are all distinguishable. 
We hold that the evidence was factually sufficient to support the jury=s rejection of appellant=s affirmative defense of insanity.








We overrule appellant=s second point.

IV.  Factual Sufficiency

In his third point, appellant
complains that the evidence is factually insufficient to support the deadly
weapon finding.

A.  Standard of Review








In reviewing the factual
sufficiency of the evidence to support a conviction, we are to view all the
evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  There are two
ways evidence may be factually insufficient: 
(1) when the evidence supporting the verdict or judgment, considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt;
or (2) when there is evidence both supporting and contradicting the verdict or
judgment and, weighing all of the evidence, the contrary evidence is so strong
that guilt cannot be proven beyond a reasonable doubt.  Id. at 484-85.  AThis standard acknowledges that evidence of guilt can >preponderate= in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 

In performing a factual
sufficiency review, we are to give deference to the fact finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper factual sufficiency
review requires an examination of all the evidence.  Id. at 484, 486-87.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint
on appeal.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Applicable Law








A deadly weapon is Aanything that in the manner of its use or intended use is capable of
causing death or serious bodily injury.@  Tex. Penal Code Ann. ' 1.07(a)(17)(B) (Vernon Supp. 2006); Gordon v. State, 173
S.W.3d 870, 873 (Tex. App.CFort Worth 2005, no pet.); Dotson v. State, 146 S.W.3d 285, 299
(Tex. App.CFort Worth
2005, pet. ref=d).  An object qualifies as a deadly weapon if the
actor intends a use of the object in which it would be capable of causing death
or serious bodily injury.  Bailey v.
State, 38 S.W.3d 157, 159 (Tex. Crim. App. 2001); Gordon, 173 S.W.3d
at 873; Dotson, 146 S.W.3d at 299.

C.  Analysis

Appellant contends that the
only evidence about his use of the knife came from his and Trevino=s testimony, which shows that Trevino was stabbed in the arm and that
Trevino left the emergency room without treatment because he got tired of
waiting.

Trevino testified that
appellant stabbed him in the chest with a knife.  A photograph of Trevino=s wound shows that it was in his left upper chest, near his shoulder
and arm.  After being stabbed, Trevino
saw that his shirt was torn and blood was running down his chest.  Trevino stated that he was in pain for
several days after being stabbed and that his arm Awas stiff to the point to where it was hard to move it without hurting
real bad.@

Trevino estimated that the
blade of the knife was approximately four to six inches long but could be
shorter; appellant told Detective Desmarais that the knife was three and
one-half inches long.  Appellant
testified that he stabbed Trevino but that he did not intend to injure or kill
Trevino. 








Officer Robinson testified
that when she arrived at the scene, she saw appellant sitting on the sidewalk
at the corner of Houston and Third Streets. Officer Robinson testified that she
found a knife on the ground next to appellant. 
She stated that the knife was capable of causing death or serious bodily
injury.  Detective Desmarais also
testified that the knife appellant used to stab Trevino was capable of causing
serious bodily injury.

Appellant contends that the
knife was not deadly because Trevino refused medical treatment.  However, section 1.07(a)(17)(B) does not make
a deadly weapon finding contingent on the victim=s willingness to get help for his injuries.  See Tex.
Penal Code Ann. '
1.07(a)(17)(B).

Moreover, although Trevino
testified that he initially refused to go to the hospital in an ambulance, the
paramedics convinced him he should go anyway because they did not know how
badly he had been cut and because A[w]here it was, it could have been bad.@  At the hospital, he told the
nurse he wanted to leave, but a doctor came into the room and told him that
depending on the results of the x-rays, he might have to go to surgery Ain the next few minutes.@  Contrary to appellant=s contention that Trevino refused medical treatment, Trevino received
four stitches. 








Appellant further complains
that the evidence is factually insufficient to establish that the knife was
deadly because he testified that he did not intend to injure or kill
Trevino.  However, the court of criminal
appeals has held that not all deadly weapons need be used with an intent to
achieve a specific purpose.  Walker v.
State, 897 S.W.2d 812, 814 (Tex. Crim. App. 1995); Thomas v. State,
821 S.W.2d 616, 620 (Tex. Crim. App.1991). 
What matters is whether the use or intended use of the weapon is capable
of causing death or serious bodily injury. 
Walker, 897 S.W.2d at 814.

Appellant admitted that he
stabbed Trevino.  The force he used was
enough to cause blood to run down Trevino=s chest.  Trevino and two
officers all testified that the knife was capable of causing serious bodily
injury or death.  The paramedics and a
doctor were all concerned because of the location of the wound and because they
could not initially tell how deep it was. 
Reed testified that an emergency room physician told her that because of
her size, she would have died Aon the street@ from the
same stab wound.  Thus, the evidence
showed that appellant=s intended
use of the knife was capable of causing serious bodily injury or death.[11]

We hold that, when viewed
neutrally, the evidence is not so obviously weak or so greatly outweighed by
contrary proof that it would not support the deadly weapon finding beyond a
reasonable doubt.  Thus, we overrule
appellant=s third
point.

 

 








V.  Lesser-Included Offense

In appellant=s first point, he contends that the trial court abused its discretion
by failing to charge the jury on the lesser-included offense of assault with
bodily injury.

A.  Standard of Review

We use a two-pronged test to
determine whether a defendant is entitled to an instruction on a
lesser-included offense.  Rousseau v.
State, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), cert. denied, 510
U.S. 919 (1993); Royster v. State, 622 S.W.2d 442, 446 (Tex. Crim. App.
[Panel Op.] 1981) (op. on reh=g).  First, the lesser-included
offense must be included within the proof necessary to establish the offense
charged.  Salinas v. State, 163
S.W.3d 734, 741 (Tex. Crim. App. 2005);  Rousseau,
855 S.W.2d at 672-73; Royster, 622 S.W.2d at 446.  Second, some evidence must exist in the
record that would permit a jury to rationally find that if appellant is guilty,
he is guilty only of the lesser offense. 
Salinas, 163 S.W.3d at 741; Rousseau, 855 S.W.2d at
672-73; Royster, 622 S.W.2d at 446. 

B.  Applicable Law








Section 22.01 of the penal
code defines the offense of assault.  Tex. Penal Code Ann. ' 22.01 (Vernon Supp.
2006). 
Section 22.01(a)(1) states that a person commits assault if he Aintentionally, knowingly, or recklessly causes bodily injury to
another, including the person=s spouse.@  Id. ' 22.01(a)(1).  A person commits the offense of aggravated
assault if he intentionally, knowingly, or recklessly causes bodily injury to
another and Auses or
exhibits a deadly weapon during the commission of the assault.@  Id. ' 22.02(a)(2). 

C.  Analysis

Because the State concedes
that assault is a lesser-included offense of aggravated assault with a deadly
weapon, our sole inquiry is to determine if some evidence exists that would
permit a jury to rationally find appellant guilty only of the lesser offense of
assault.  Rousseau, 855 S.W.2d at
672-73.  Thus, a lesser-included offense
instruction was required if the record contains some evidence that appellant
did not use or exhibit a deadly weapon.  Moreno
v. State, 38 S.W.3d 774, 778 (Tex. App.CHouston [14th Dist.] 2001, no pet.). 
      It is undisputed that
appellant testified that he purposefully stabbed Trevino with a knife.  We have determined that the evidence supports
the conclusion that the knife was a deadly weapon.  Trevino testified that he saw the knife in
appellant=s hand after
he used it.








Appellant contends that he
was entitled to an instruction on the lesser-included offense because he
testified that he did not intend to kill or cause serious bodily injury to
Trevino, and Trevino refused to stay in the hospital for treatment.  As we have explained above, appellant=s lack of intent to kill or cause serious bodily injury is irrelevant
to this issue.  Appellant testified that
he intended to stab appellant with the knife to protect himself; therefore, he
intended to cause bodily injury.[12]  In addition, there is no evidence in the
record that Trevino refused medical treatment; to the contrary, the evidence
shows that Trevino received four stitches. 
Accordingly, we hold that no evidence exists in the record that would
have permitted the jury to rationally find that appellant was guilty only of
the lesser-included offense of assault with bodily injury.  We overrule appellant=s first point.

VI.  Conclusion

Having overruled appellant=s three points, we affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL A:   LIVINGSTON, HOLMAN, and WALKER, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 








DELIVERED:
September 21, 2006











[1]See Tex. R. App. P. 47.4.





[2]For
convenience of discussion, we will address appellant=s
points out of order.





[3]Trevino
did not clarify whether he meant Amad@ as
in angry  or Amad@ as
in mentally impaired, but from the context of his testimony, it appears he
meant that appellant looked angry.





[4]Reed
said that appellant Aleaned
in really far to where his head was . . .  beside [Trevino=s]
head.@ 





[5]Appellant
testified that he remembered doing this and that he thought people were shooting
at him.





[6]Appellant
testified that he had found the wallet and cards and that he told the police
that he was either going to Aturn them in@ or
throw them away. 





[7]Evidence
of flight shows a consciousness of guilt. 
Bigby v. State, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994), cert.
denied, 515 U.S. 1162 (1995).





[8]Contrary
to appellant=s
contention, Dr. Karten=s
testimony was not the only evidence pointing to appellant=s
sanity at the time of the offense.





[9]This
evidence conflicts with Dr. Clayton=s opinion that appellant was
only delusional about Trevino.





[10]The
court of criminal appeals overruled its opinion in Van Guilder in Meraz.  785 S.W.2d at 155.





[11]Appellant
never contended that he did not intend to stab Trevino, only that the stabbing
was justified.





[12]A
person cannot accidentally or recklessly act in self‑defense.  See Martinez v. State, 16 S.W.3d 845,
848 (Tex. App.CHouston
[1st Dist .] 2000, pet. ref=d); Avila v. State,
954 S.W.2d 830, 843 (Tex. App.CEl Paso 1997, pet. ref=d); Johnson
v. State, 915 S.W.2d 653, 659 (Tex. App.CHouston [14th Dist.] 1996,
pet. ref=d).  The jury was instructed on self-defense, but
appellant has not challenged the jury=s rejection of that defense.